[No. A028856. First Dist., Div. One. Apr. 24, 1986.]

FRANCIS PUSATERI et al., Plaintiffs and Respondents, v.
E. F. HUTTON & COMPANY, INC., Defendant and Appellant.

248

**COUNSEL**

Bruce W. Belding, Peter W. Colby and Dinkelspiel & Dinkelspiel for Defendant and Appellant.

Frank L. Crist, Jr., Patricia J. Van Horn and Crist, Griffiths, Bryant, Schulz, Biorn & Clohan for Plaintiffs and Respondents.

**OPINION**

**RACANELLI, P. J.**—This appeal presents the single issue whether sufficient evidence was present for a jury to assess punitive damages against a stock brokerage firm. Our review of the record impels an affirmative conclusion.

Plaintiffs and respondents Francis and Jenny Pusateri were awarded $45,000 in compensatory damages in a tort action against defendant E. F. Hutton & Company, Inc. (E. F. Hutton) and its account executive, Gilbert J. Johnson, due to Johnson's "churning" of plaintiffs' account and engaging in a variety of unauthorized purchasing and trading transactions resulting in losses to plaintiffs of approximately $120,000. The jury also awarded punitive damages of $160,000 against E. F. Hutton alone. Thereafter, the trial court denied E. F. Hutton's motions for a new trial and for judgment notwithstanding the verdict (nov). E. F. Hutton appeals only from the judg-

ment awarding punitive damages and the order denying judgment nov. We will conclude that the evidence adequately supports the award of punitive damages.

## Standard of Review

■ "The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found to uphold the trial court's denial of the motion. (*Gordon* v. *Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 511 [78 Cal.Rptr. 417, 39 A.L.R.3d 809]; *Stevens* v. *Roman Catholic Bishop of Fresno, supra,* 49 Cal.App.3d at p. 889 [123 Cal.Rptr. 171].)" (*Hobbs* v. *Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 192 [210 Cal.Rptr. 387].)

■ "When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)

■ E. F. Hutton argues, in essence, that there is *no* evidence that it acted in conscious disregard of plaintiffs' rights or that it authorized or ratified the acts of its agent, Johnson. (See generally Civ. Code, § 3294, subd. (b).) We disagree.

■ Our highest court has stated the governing rule in the following manner: "'"... California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a principal because of an act by an agent if, but only if '(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act.'" [] (*Hale* v. *Farmers Ins. Exch.,* 42 Cal.App.3d 681, 690-691 [117 Cal.Rptr. 146].)' [See also *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822 (157 Cal.Rptr. 482, 598 P.2d 452).]" (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 950 [160 Cal.Rptr. 141, 603 P.2d 58].)

*Discussion*

 Viewing the evidence in a light favorable to the plaintiffs and respondents, the following appears: Plaintiff Francis Pusateri had acquired some 21,000 shares of stock in Apple Computer, Inc., through exercise of employee stock-option plans during his employment. Pusateri had suffered a heart attack in 1972, and concern for his health eventually resulted in his retirement from Apple. In 1981, Apple made arrangements for present and former employees to sell shares of Apple stock without a broker. Pusateri sold about 6,000 shares for approximately $188,000 which he intended to invest to assure an income for his wife in the event of his disability. (Pusateri, then in his 50's, worked as a consultant without fixed employment or any retirement benefits.) At the suggestion of Apple's finance officer, Pusateri made an appointment with a local E. F. Hutton broker. However, prior to that appointment, plaintiffs met Johnson at a social event and decided, instead, to discuss their investment plans with him.

At their very first meeting, plaintiffs told Johnson they wished to invest in tax-free bonds and money market accounts to obtain a monthly income of $2,000 to $2,500; they expressly informed him that they did not want to purchase stock because of a prior bad experience. Johnson assured them that their targeted income was easily attainable and filled out E. F. Hutton's standard new client card. The investment objective marked on the card included "tax-free income, moderate growth and long term growth." Johnson did not check the boxes for businessman's risk, fixed income, appreciation, trading, short-term, commodities or option trading. Johnson conceded that plaintiffs desired a conservative approach, which would not include margin trading, "in-and-out" trading (quick purchase and sales transactions) or purchase of highly volatile brokerage stocks. Johnson also agreed that the plaintiffs' investment objectives were never changed during the time he acted as their broker.

In the following weeks, Johnson purchased stock in a volatile cellular communications company. Upon receiving the confirmation slip, Pusateri protested but ultimately relied on Johnson's recommendation to retain the stock. By the end of June, Johnson had purchased over $11,000 in stock on margin without Pusateri's knowledge or written consent. On July 1, 1981, Johnson brought a margin loan agreement to plaintiffs' home, explaining only that it was another "form" to establish the account. Plaintiffs signed the document without reading it by virtue of their trust in Johnson. Plaintiffs did not know they were buying stock on credit and were not told what a margin account was.

Johnson's churning activities multiplied (approximately 130 transactions) over the next several months. In September, he presented them with an

option account form, again without explanation, which they compliantly signed.

By December, the margin loan had increased to $190,000. The average interest rate charged by E. F. Hutton was 17 to 18 percent. During the same period, the average yield on tax-free bonds was approximately 10 percent and the money market account interest rate was between 17 and 18 percent. Johnson engaged in option trading and "in-and-out" trading from October through December. Inquiries from Pusateri to Johnson regarding the account resulted in the latter's assurances that they were "making money."

In February 1982 Johnson left E. F. Hutton's employment, and the account was thereafter reassigned to Mr. Clarke, another E. F. Hutton broker. However, it was not until March 1982, upon receiving their tax returns prepared by an accountant, that plaintiffs first learned that they owed E. F. Hutton $3,600 in interest on the margin account and lacked sufficient funds in their account to pay their taxes. The value of their original investment of $196,000 had shrunk to $96,880 in the space of just over one year.

In November 1981, David Nee, vice-president and branch manager of E. F. Hutton's Palo Alto office, received his regular monthly report of plaintiffs' account. E. F. Hutton's normal management practice required special supervisorial attention to any account generating more than $2,000 in commissions and reflecting over 10 trades a month. Consequently, Nee reviewed the account with Johnson and told him he would be calling Pusateri to discuss his account. Nee admitted that the call was triggered by the indicated "excessive activity" but failed to tell Pusateri anything about the status of the account, merely inquiring whether he got along well with Johnson. Though responsible for review of the new client card specifying the Pusateris' investment objectives, Nee neglected to check their file and review their stated objectives. Despite his knowledge of the apparent churning activities and the fact that plaintiffs' account had lost money and borrowed heavily from E. F. Hutton, Nee mentioned *none* of these factors during this phone conversation. Johnson later advised Pusateri that the call was merely "routine."

None of the monthly statements received by plaintiffs from E. F. Hutton indicated the amount of commissions paid to Johnson. Nee assumed that E. F. Hutton did not want to call attention to income earned by the broker while their customers were experiencing losses. Both Pusateri and his accountant mistakenly believed that the statement item labeled "Portfolio Total Value" indicated the market value of his account. In fact, it was impossible to determine the actual value of the stock in the account from the

monthly report. Only by deducting the amount of his margin obligations could Pusateri have determined the actual value of his account.

Shortly after his March 1982 discovery, Pusateri received a call from Clarke, who told him that his account was the "laughing stock" of the office. After Pusateri confronted Nee, his account was assigned to yet another broker (Gordon) who had the common decency to inform Pusateri the account had been badly mismanaged, that Johnson had traded to make a "killing" and that he should consult an attorney. Upon learning the true condition of their account, plaintiffs promptly transferred their investment portfolio to another brokerage house.

At trial, plaintiffs' expert testified that trading in their account was excessive, yielding large commissions, and that the investments were highly imprudent in light of their financial objectives, clear indications that the account had been mishandled.

It is undisputed that during the relevant period Nee was acting as an authorized officer or managing agent of E. F. Hutton and that Johnson, as plaintiffs' broker, was a fiduciary owing a high duty to act in good faith and to render a full and fair disclosure of all facts affecting their rights and interests. (*Hobbs* v. *Bateman Eichler, Hill Richards, Inc.*, *supra*, 164 Cal.App.3d at p. 201.) Nor does E. F. Hutton contend that Johnson's actions were not malicious, oppressive or fraudulent within the meaning of the statute.

In applying the standard for awarding punitive damages against employers, courts have generally required a showing that a corporate defendant either itself committed acts of oppression, fraud or malice, or that it authorized or ratified such acts on the part of its employee. (*Hobbs* v. *Bateman Eichler, Hill Richards, Inc.*, *supra*, 164 Cal.App.3d at pp. 192-194.) Malice will not be established merely by a showing of intent to harm the plaintiff but must involve a conscious disregard for the plaintiff's rights. (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894-895 [157 Cal.Rptr. 693, 598 P.2d 854].) We are satisfied from our review of the record that substantial evidence exists to support the award of punitive damages against E. F. Hutton as the corporate employer.

Failure to dismiss an employee after the commission of oppressive acts is evidence of ratification if the managing agent has knowledge of, or the opportunity to learn of, the misconduct and fails to investigate. (*McChristian* v. *Popkin* (1946) 75 Cal.App.2d 249, 256 [171 P.2d 85] [theatre manager's failure to investigate patron's complaint of employee assault or attempt to redress the wrong].) In *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348], a particularly egregious case, circum-

stantial evidence existed that management knew of tests demonstrating a dangerous design defect in Ford Pintos but nonetheless proceeded with production.

*Hobbs* v. *Bateman Eichler, Hill Richards, Inc.*, *supra*, 164 Cal.App.3d 174, presents a closely analogous setting. In *Hobbs,* the broker likewise churned the account, made unsuitable investments and unauthorized transactions and neglected to inform the client of losses in the account. The court affirmed a jury verdict of $220,000 in punitive damages against the brokerage firm on a theory of ratification evidenced by a history of hundreds of transactions, hefty commissions and imprudent, unauthorized stock purchases. The only action taken by the managing officer, Norlander, was to send a form letter advising the client of his duty to review the account and requesting her to sign and return a statement indicating that the handling of the account was consistent with her stated investment objectives. (*Id.,* at pp. 186-187.) Norlander testified, however, he would have approved the account even if he had known of the broker's actions. (*Id.,* at p. 189.)

In the instant case, Nee was more equivocal regarding his knowledge of the facts. He stated he could not remember some of the crucial events of November 1981. But the evidence strongly supports an inference of his knowledge of the mishandling of plaintiffs' account as well as failure to undertake any remedial action. Nee was aware of the excessive activity in plaintiffs' account[1] and their conservative investment goals, yet failed to inspect the Pusateris' portfolio. Evidence was admitted of rule 405 of the New York Stock Exchange, the "know your customer" rule, requiring the brokerage firm to know all details regarding every customer's account, including the customer's level of sophistication and investment objectives. Nee admitted that the large number of trades and amount of commissions prompted his November contact with Pusateri and his discussion of the account with Johnson. Nee also admitted that he never mentioned the condition of the account or the fact that nearly $200,000 was owed to E. F. Hutton on a margin account. Nee agreed that the level of activity in the account indicated a need for his review. Since the same degree of unusual account activity occurred over several months, it could readily be inferred that Nee was aware of such circumstances through the information reflected in the monthly reports. The "laughing stock" derision, although made after Johnson's departure, provides some evidence of the widespread knowledge

---

[1] In the thirteen months that plaintiffs' account was handled by E. F. Hutton, over $47,000 in interest and commissions was generated. Commissions exceeded $2,000 in every month except one. In the eight months that Johnson handled the account, the cost to maintain it in comparison to its value was approximately 24 percent. Expert testimony indicated that such an excessive rate essentially precluded any opportunity for the Pusateris' account to generate a profitable return.

within the brokerage firm of Johnson's mismanagement of the account. Obviously, Nee as a managing officer would likely have known of such intramural conduct. Finally, although the excessive activities which flagged the account for inspection should similarly have triggered Nee's inquiry whether plaintiffs understood the handling of their account, only the innocuous query whether they "got along well" was initiated. In the succeeding months that Johnson continued to mishandle the account, Nee—inexplicably—did nothing to determine whether the unsuspecting clients were even aware of what was happening. Thus, although Nee did not testify directly that he knew of Johnson's activity and nonetheless approved it, there was sufficient circumstantial evidence from which the jury could conclude that this was true. From the sum of such persuasive evidence, together with Nee's direct knowledge of the status of the account, the jury was entitled to find that Nee consistently ratified Johnson's outrageous and oppressive conduct justifying the award of punitive damages against his corporate employer.

Whether this punitive form of relief will tend to arrest such predatory practices as hopefully predicted (*Hobbs* v. *Bateman Eichler, Hill Richards, Inc., supra,* 164 Cal.App.3d at p. 204) still remains to be witnessed.

The judgment and order from which the appeal is taken, and each, are affirmed in all respects.

Newsom, J., and Holmdahl, J., concurred.