[No. S070177. Aug. 23, 1999.]

THOMAS M. WHITE, Plaintiff and Respondent, v.
ULTRAMAR, INC., Defendant and Appellant.

564

## COUNSEL

Seyfarth, Shaw, Fairweather & Geraldson, William J. Dritsas, David D. Kadue and Michael J. Sears for Defendant and Appellant.

Littler Mendelson, David S. Durham, Henry D. Lederman and Arthur M. Eidelhoch for Beverly Enterprises-California, Inc., as Amicus Curiae on behalf of Defendant and Appellant. . .

Horvitz & Levy, Peter Abrahams, Mitchell C. Tilner and S. Thomas Todd for the American International Companies and Fire Insurance Exchange as Amici Curiae on behalf of Defendant and Appellant.

Sidley & Austin, Jeffrey A. Berman, James M. Harris and Deborah J. Muns for Employers Group as Amicus Curiae on behalf of Defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Paul Grossman, George W. Abele and Christina L. McEnerney for California Employment Law Council as Amicus Curiae on behalf of Defendant and Appellant.

Larabee & Loadman and Dale R. Larabee for Plaintiff and Respondent.

Law Offices of Ian Herzog, Evan D. Marshall, Ian Herzog; Douglas Devries; Bruce Broilett; Christine Spagnoli; Roland Wrinkle; Wayne McClean; James Sturdevant; Harvey R. Levine; Leonard Sacks; Daniel Smith; Robert Steinberg; Tony Tanke; Deborah David; Thomas G. Stolpman; Lea-Ann Tratten; Lawrence Drivon; William D. Turley; Steven J. Keifield; Thor

Emblem; Mary E. Alexander; David Rosen; Rick Simons; Joseph Harbison III; Moses Lebovits; and David Casey, Jr., for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Respondent.

William C. Quackenbush as Amicus Curiae on behalf of Plaintiff and Respondent.

Joseph Posner; and Norman Pine for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**CHIN, J.**—We granted review to resolve a conflict in the Courts of Appeal over how to define the statutory term "managing agent" for determining corporate punitive damage liability under Civil Code section 3294, subdivision (b).[1] Some courts, including the Court of Appeal in this case, broadly define the term to include supervisory employees who have limited decisionmaking authority, but possess the ability to hire and fire company employees. (See, e.g., *Stephens* v. *Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394, 1404 [245 Cal.Rptr. 606] (*Stephens*).) Others limit the term's application to those employees who exercise substantial discretion in their decisionmaking so that their decisions ultimately determine corporate policy. (See, e.g., *Kelly-Zurian* v. *Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421-422 [27 Cal.Rptr.2d 457] (*Kelly-Zurian*).)

We disagree with the Court of Appeal's conclusion that the mere ability to hire and fire employees renders a supervisory employee a managing agent under section 3294, subdivision (b). Instead, we conclude the Legislature intended the term "managing agent" to include only those *corporate employees who exercise substantial independent authority and judgment in their*

---

[1] All statutory references are to the Civil Code unless otherwise noted.

Section 3294 allows a plaintiff to seek punitive damages (as exemplary damages) "for the breach of an obligation not arising from contract" when the plaintiff can show by "clear and convincing evidence" that a defendant "has been guilty of oppression, fraud, or malice." (§ 3294, subd. (a).)

In 1980, the Legislature added subdivision (b) to section 3294, to add a special qualification for employer liability for those damages. Subdivision (b) states, in relevant part, that an employer shall not be liable for punitive damages based on an employee's acts unless "the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." The statute includes an additional qualification for corporate employers, who may not be liable for punitive damages unless "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice [is] on the part of an officer, director, or managing agent of the corporation." (§ 3294, subd. (b).)

corporate decisionmaking so that their decisions ultimately determine corporate policy. The scope of a corporate employee's discretion and authority under our test is therefore a question of fact for decision on a case-by-case basis.

As noted, we disagree with the Court of Appeal to the extent its decision conflicts with our construction of "managing agent" under section 3294, subdivision (b). Nonetheless, we affirm its judgment in plaintiff's favor after concluding that Lorraine Salla, defendant's zone manager and the employee who fired plaintiff, was a managing agent under the statute.

A. *Facts*

Plaintiff Thomas M. White (plaintiff) worked in a convenience store owned by Ultramar, Inc. (Ultramar). He was promoted to assistant manager in November 1992. The store manager, Russ Gossman, who hired plaintiff, told him employees could ignore the company's written drink policy that they could have free fountain sodas and coffee, but only if they used their own cups. The policy required employees to pay for their drinks if they used company cups. The store manager who replaced Gossman, Larry Asemka, also told plaintiff that he did not follow the store's written drink policy. Asemka was later fired. He asked plaintiff to testify at his unemployment benefits hearing, and plaintiff agreed to do so.

The hearing was in the morning; plaintiff's shift at the store did not begin until the afternoon. On the morning of the hearing, plaintiff went to the store to pick up another employee, Ernest Fimbres, who had also agreed to testify at the hearing. Plaintiff, who was not on duty at the time, entered the store and drew a soda from the soda fountain; Fimbres also took a drink from the fountain. Neither plaintiff nor Fimbres paid for the sodas even though they used company cups in violation of the company's written drink policy.

Plaintiff testified at trial that the new store manager, Thomas McKinney, saw him take the soda, that he asked plaintiff to begin his shift earlier in the day, that plaintiff agreed to do so, and that he said nothing else as plaintiff and Fimbres left the store without paying for their drinks. McKinney testified that he told plaintiff and Fimbres they were supposed to pay for the drinks. He called Salla and asked her permission to fire them when they did not. According to McKinney, Salla told him she would consult with the company's human resources department before taking any action against the employees.

Plaintiff, Salla, and Fimbres testified at Asemka's unemployment hearing. When plaintiff went to work after the hearing, McKinney told him he was suspended and ordered him to wait outside the store until Salla arrived.

According to plaintiff, when Salla arrived, she told him he "kn[e]w better than to do something like that against [her]." Plaintiff told her she could not fire him for testifying at Asemka's hearing; she replied she was firing him for stealing soda. Fimbres was also fired. Salla testified at trial that she fired plaintiff for refusing to pay for a drink. The store was equipped with a videotaping system designed to operate 24 hours a day. On the day Salla fired plaintiff, however, there was a gap of several minutes in the tape; the missing tape covered the time period when plaintiff and Fimbres got drinks in the store and McKinney, the manager, purportedly told them they had to pay.

Plaintiff sued Ultramar, claiming, inter alia, that he was wrongfully terminated in retaliation for testifying at the unemployment hearing, a violation of company policy[2] and public policy under *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (*Tameny*). The jury awarded him $42,000 in compensatory damages and $300,000 in punitive damages.

As to the punitive damages question, the jury was instructed under BAJI No. 14.74, which provides that "[a]n employee acts in a managerial capacity where the degree of discretion permitted the employee in making decisions is such that the employee's decisions will ultimately determine the business policy of the employer." The jury awarded plaintiff punitive damages after finding "by clear and convincing evidence that [Ultramar] was guilty of malice, oppression or fraud" for firing plaintiff. However, the jury was not asked to specify which Ultramar employee it found to be a managing agent. After trial, the judge granted plaintiff's motion for prevailing-party attorney

---

[2]Ultramar included a copy of its "Employment Policies and Standards" in an appendix to its Court of Appeal opening brief. This document specifically informs all employees that the corporation "will not tolerate discriminatory, unequal or improper treatment of others." The company's "policy against discrimination and harassment" also forbids employees from discriminating against other employees "in any form," and "in both employment, action and in every day personal interactions." We could find no direct reference to unemployment hearings in the manual itself. Moreover, Ultramar does not argue, and the record does not show, that Salla acted in violation of a specific written policy forbidding retaliation against employees under the circumstances here. We note, however, that Ultramar admitted that it was company policy to contest their terminated employees' rights to collect unemployment compensation.

Although the issue is not presented here, and we do not address it or offer our view on its merits, in future cases, if a company has a written policy that specifically forbids retaliation against employees who testify at unemployment hearings, it may operate to limit corporate liability for punitive damages, as long as the employer implements the written policy in good faith. (See *Kolstad* v. *American Dental Assn.* (1999) 527 U.S. 526, 541-543 [119 S.Ct. 2118, 2127-2128, 144 L.Ed.2d 494] [existence of written policy forbidding discrimination under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) may operate as a bar to punitive damage liability].)

fees under Labor Code section 218.5 and awarded him approximately $70,000 in addition to the compensatory and punitive damages awards.

Ultramar appealed. The Court of Appeal reversed the attorney fee award, but otherwise affirmed the judgment in plaintiff's favor on his *Tameny* claim. The court also upheld the punitive damages award against Ultramar on the ground that Salla was a managing agent under section 3294, subdivision (b), because she was the supervisor who ultimately fired him. We granted Ultramar's petition for review, and limited our review to the punitive damages question and the construction of "managing agent" under section 3294, subdivision (b).

### B.  *Background*

Before its 1980 amendment, section 3294 provided: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Stats. 1905, ch. 463, § 1, p. 621.) The statute was originally enacted in 1872, with minor amendments in 1901 and 1905.

Courts interpreted section 3294 to mean that a California corporation was liable for punitive damages only if the corporation itself, acting through those who managed its general affairs, engaged in the requisite oppression, fraud, or malice. Although a corporation could be liable for compensatory damages for an employee's tort under the respondeat superior doctrine, the corporation was not responsible for punitive damages where it neither personally directed nor ratified the wrongful act.

As stated in an early case, "The entire basis of the doctrine of vindictive [punitive] damages is that the *person*, himself, *who is sued* has been guilty of recklessness or wickedness which amounts to a criminality that should be punished for the good of society, and as a warning to the individual; but to award such damages against the master for the criminality of the servant is to punish a man for that of which he is not guilty." (*Warner* v. *Southern Pacific Co.* (1896) 113 Cal. 105, 112 [45 P. 187], original italics; see also *Lowe* v. *Yolo County etc. Water Co.* (1910) 157 Cal. 503, 511-512 [108 P. 297] [affirming punitive damages award against water company for withholding irrigation water, after noting the company's president and general manager, who acted on behalf of the board of directors, jointly made the wrongful and oppressive decision]; *Hartman* v. *Shell Oil Co.* (1977) 68 Cal.App.3d 240, 248-250 [137 Cal.Rptr. 244] [upholding punitive damage

award after finding the wrong was authorized at the level of responsible corporate management]; *Gordon* v. *Industrial Acc. Com.* (1926) 199 Cal. 420, 426-427 [249 P. 849, 58 A.L.R. 1374] [noting that statutes governing corporations define the term "managing agent" as one who has discretionary powers of direction and control over corporate business]; *Towt* v. *Pope* (1959) 168 Cal.App.2d 520, 528-529 [336 P.2d 276] [in workers' compensation liability action, distinguishing "executive officials, presidents, vice-presidents, and managing agents" of corporation from superintendents, foremen, and "those immediately in control and management of the particular employee, his work and his place of employment"].)

In 1979, this court looked to the Restatement Second of Torts section 909 to determine when a corporate insurer might be liable for punitive damages based on its agent's wrongful denial of policy benefits. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822-823 [169 Cal.Rptr. 691, 620 P.2d 141] (*Egan*); see *Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681 [117 Cal.Rptr. 146], disapproved on other grounds in *Egan, supra,* 24 Cal.3d at p. 822, fn. 5.) The tentative draft of the Restatement provided that punitive damages were allowed if "(a) the principal authorized the doing and the manner of the act, or [¶] (b) the agent was unfit and the principal was reckless in employing him, or [¶] (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or [¶] (d) the principal or a managerial agent of the principal ratified or approved the act." (Rest.2d Torts (Tent. Draft No. 19, Mar. 30, 1973) § 909, p. 85.) (The current version of the Restatement Second of Torts section 909 differs primarily in its substitution of "principal or a managerial agent" wherever "principal" appeared in the section's tentative draft.)

Comment b to section 909 of the Restatement Second of Torts stated the rationale behind imposing punitive damages liability on employers when their employees engaged in wrongful conduct: "The rule stated in this Section results from the reasons for awarding punitive damages, which make it improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously. It is, however, within the general spirit of the rule to make liable an employer who has recklessly employed or retained a servant or employee who was known to be vicious, if the harm resulted from that characteristic. . . . Nor is it unjust that a person on whose account another has acted should be responsible for an outrageous act for which he otherwise would not be if, with full knowledge of the act and the way in which it was done, he ratifies it, or, in cases in which he would be liable for the act but not subject to punitive damages, he expresses approval of it. . . . In these cases, punitive damages are granted primarily because of the principal's own wrongful conduct. [¶]

Although there has been no fault on the part of a corporation or other employer, if a person acting in a managerial capacity either does an outrageous act or approves of the act by a subordinate, the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions." (Rest.2d Torts, § 909, com. b, p. 468.)

*Egan* involved a bad faith claim against an insurer for breach of the covenant of good faith and fair dealing based on the failure of two employees to investigate adequately a claim before denying insurance coverage. The court concluded that, under the Restatement, an insurer's liability for punitive damages should not turn on any official title, but on whether either of its two employees acted in a "managerial capacity," depending on the "degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." (*Egan, supra,* 24 Cal.3d at pp. 822-823.) *Egan* observed that a corporate defendant should not be able to shield itself " 'from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions.' " (*Id.* at p. 823.) In concluding the insurer's employees worked in a managerial capacity, *Egan* emphasized that the employees exercised substantial discretionary authority over decisions that resulted in an "ad hoc formulation of policy," and their actions could be imputed to the employer. (*Id.* at p. 823.)

Following *Egan, supra,* 24 Cal.3d 809, we revisited the punitive damages question in a case involving an engineer's claim that the managers of a large international corporation treated him maliciously. (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 952 [160 Cal.Rptr. 141, 603 P.2d 58] (*Agarwal*).) Again, we applied *Egan*'s test to conclude that the managers who fired the plaintiff were vested with a degree of discretion over decisions that would ultimately determine corporate policy. This discretion, we concluded, was sufficient to support imposing punitive damages against the corporation under former section 3294. (*Agarwal, supra,* 25 Cal.3d at p. 952.)

C.   *Section 3294, Subdivision (b), and Legislative Intent*

After *Egan, supra,* 24 Cal.3d 809, and *Agarwal, supra,* 25 Cal.3d 932, the Legislature drafted Senate Bill No. 1989 (1979-1980 Reg. Sess.) to codify and refine further the requirements for employer punitive damages liability. The new amendment added subdivision (b) to section 3294. (Stats. 1980, ch. 1242, § 1, p. 4217.) Following subsequent minor amendments, the statute now states in pertinent part: "An employer shall not be liable for [punitive] damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the

rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. *With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.*" (§ 3294, subd. (b), italics added.) The drafters' goals were to avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from corporate liability for punitive damages. (See *Weeks* v. *Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1150-1151 [74 Cal.Rptr.2d 510]; see also *College Hospital, Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 712-713 [34 Cal.Rptr.2d 898, 882 P.2d 894] [noting that, after 1979, the Legislature limited circumstances under which an employer could be held liable for punitive damages].) Section 3294 is no longer silent on who may be responsible for imputing punitive damages to a corporate employer. For corporate punitive damages liability, section 3294, subdivision (b), requires that the wrongful act giving rise to the exemplary damages be committed by an "officer, director, or managing agent."

■ Under general settled canons of statutory construction, we ascertain the Legislature's intent in order to effectuate the law's purpose. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) We must look to the statute's words and give them their "usual and ordinary meaning." (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) "The statute's plain meaning controls the court's interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent." (*Kobzoff* v. *Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514].) Because section 3294, subdivision (b), does not specifically define the term "managing agent," we turn to expressions of legislative intent to construe it in the statute's relative context.[3]

In addition to these general principles, a specific rule of statutory interpretation is especially applicable to our task. ■ That is, when the Legislature amends a statute, we presume it was fully aware of the prior judicial construction. (See *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155] (*Palos Verdes*).)

---

[3]On May 26, 1999, we granted Ultramar's request that we take judicial notice of certain materials from the legislative history of section 3294, subdivision (b), including committee reports and individual legislators' (including co-authors') comments from the Assembly and Senate committee bill files.

■ Using these interpretive rules to guide us, we believe that in amending section 3294, the Legislature intended (like *Egan, supra,* 24 Cal.3d at p. 823) to limit corporate punitive damage liability to those employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy. Our view finds support in a principle which "seeks to ascertain common characteristics among things of the same kind, class, or nature when they are cataloged in legislative enactments." (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873] [describing the *ejusdem generis* principle].) The principle requires that when we interpret general statutory terms following the listing of specific classes of persons or things, we must construe the terms as applying to persons or things of the same general nature or class as those listed. The rule " ' "is based on the obvious reason that if the [writer] had intended the general words to be used in their unrestricted sense, [he or she] would not have mentioned the particular things or classes of things which would in that event become mere surplusage." ' " (*Id.* at p. 1160.) Using the doctrine to aid our interpretation of "managing agent," we note that section 3294, subdivision (b), placed that term next to the terms "officer" and "director," intending that a managing agent be more than a mere supervisory employee. The managing agent must be someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, by selecting the term "managing agent," and placing it in the same category as "officer" and "director," the Legislature intended to limit the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages.

Our interpretation of the Legislature's intent in adopting section 3294, subdivision (b), is shared by *Kelly-Zurian, supra,* 22 Cal.App.4th 397. *Kelly-Zurian* held that supervisory employees are not managing agents under section 3294, subdivision (b), unless they in fact exercise substantial discretion in their decisionmaking capability. (*Kelly-Zurian, supra,* 22 Cal.App.4th at p. 421.) In *Kelly-Zurian,* a sexual harassment action that resulted in a plaintiff's verdict for compensatory damages, the Court of Appeal held that the plaintiff was not entitled to punitive damages because evidence was lacking that her supervisor was a managing agent under section 3294, subdivision (b), even though he was a company administrator who had direct authority over her employment responsibilities. (*Kelly-Zurian, supra,* 22 Cal.App.4th at pp. 421-422.)

*Kelly-Zurian* based its decision on the plaintiff's failure to present evidence showing her supervisor was engaged in policymaking, whereas the defendant corporation presented substantial evidence to the contrary. (*Kelly-Zurian, supra,* 22 Cal.App.4th at p. 422.) For its reasoning, *Kelly-Zurian*

relied on *Egan*'s observation that " '[t]he determination whether employees act in a managerial capacity [i.e., are managing agents] does not necessarily hinge on their "level" in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.' (*Egan*[,] *supra*, 24 Cal.3d at pp. 822-823.)" (*Kelly-Zurian, supra*, 22 Cal.App.4th at p. 421.) *Kelly-Zurian* specifically observed that the evidence showed the supervisor "had immediate and direct control over [the plaintiff] with the responsibility for supervising her performance. However, the fact [the plaintiff] reported to [her supervisor] and that he had the authority to terminate her merely reflect[ed] [he] was [her] *supervisor*, not that he was a managing agent." (*Id.* at pp. 421-422, original italics.) The court emphasized that the supervisor had no authority to establish or change the company's business policies. That authority rested in the parent company in another state. (*Id.* at p. 422.) The court also considered that the main office was in charge of business operations; it set business policies and guidelines and performed employee reviews. Moreover, the supervisor could not set the plaintiff's salary or approve a raise for her without the main office's authorization. (*Ibid.*) All of the factors considered in *Kelly-Zurian* were part of the managing agent equation, although not an exclusive list. They were important in determining whether the supervisor was a managing agent whose conduct could justify awarding punitive damages against his employer.

The Court of Appeal rejected *Kelly-Zurian*'s approach to the "managing agent" question, erroneously concluding that "*Egan* expressly rejected a narrow construction of the term 'managing agent' for purposes of determining liability for punitive damages." Instead, the Court of Appeal followed the more recent *Stephens* decision (*Stephens, supra*, 199 Cal.App.3d 1394). *Stephens* concluded that a district supervisor of a national property management firm was a managing agent within the meaning of section 3294, subdivision (b), because he "had immediate and direct control over the decision to demote plaintiff, and he was directly responsible for evaluating plaintiff's performance." (*Stephens, supra*, 199 Cal.App.3d at p. 1404.)[4] In rejecting *Kelly-Zurian*'s reasoning, and defining managing agent to include essentially all supervisory employees who possess the ability to hire and fire workers, the Court of Appeal concluded that Salla was a managing agent for section 3294 purposes because she "had supervisory control over [plaintiff's] employment and had the most immediate control over the decision to

---

[4]We disapprove *Stephens, supra*, 199 Cal.App.3d at page 1404, to the extent it conflicts with our construction of the "managing agent" term. We also note that the Court of Appeal relied on language in *Agarwal, supra*, 25 Cal.3d at page 952, that arguably implied mere supervisors could be managing agents as long as they have the ability to hire and fire employees. To the extent language in *Agarwal* could be so construed, we disapprove it.

fire him." In so doing, the Court of Appeal implicitly held that the language of section 3294, subdivision (b), is broad enough to render all corporate agents potentially responsible for punitive damage liability. Of note, however, is the fact that the court specifically did not address whether Salla exercised substantial discretionary authority over decisions that ultimately determine corporate policy.

The Court of Appeal's overly broad interpretation of the term "managing agent" effectively abrogates the statute's "officer, director, or managing agent" requirement. As amicus curiae Beverly Enterprises-California, Inc., appearing on Ultramar's behalf, explains, in the overwhelming majority of employment cases, the wrongdoer, by definition, had supervisory authority over the plaintiff. A rule defining managing agent as any supervisor who can hire or fire employees, but who does not have substantial authority over decisions that ultimately determine corporate policy, effectively allows punitive damage liability without proof of anything more than simple tort liability, which we have long recognized is insufficient. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980] (*Neal*); *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854] [something more than mere commission of a tort is always required for punitive damage liability].) If we equate mere supervisory status with managing agent status, we will create a rule where corporate employers are liable for punitive damages in most employment cases. Such a rule would ignore *Egan*'s sound reasoning, defeat the Legislature's intent to discourage corporate acts of oppression, fraud, or malice under section 3294, subdivision (b), and end our emphasis on the limited role and deterrent purpose of punitive damages awards: "to punish wrongdoers and thereby deter the commission of wrongful acts." (*Neal, supra,* 21 Cal.3d at p. 928, fn. 13; see also *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348] ["[T]he quintessence of punitive damages is to deter future misconduct by the defendant . . . ."].) It might also discourage employers from making good faith efforts to enforce policies that forbid discrimination or retaliation. (See *Kolstad* v. *American Dental Assn., supra,* 527 U.S. at pp. 539-540 [119 S.Ct. at pp. 2126-2127] [employer may not be liable for managerial agents' discriminatory employment decisions that are contrary to employer's good faith efforts to comply with title VII of Civil Rights Act of 1964].)

Other Court of Appeal cases have also rejected a broad interpretation of the managing agent term. Like *Kelly-Zurian, supra,* 22 Cal.App.4th at page 421, these cases have interpreted section 3294, subdivision (b), and *Egan, supra,* 24 Cal.3d at pages 822-823, to permit imposition of punitive damages on an employer who has vested the offending employee with substantial

discretionary authority over decisions that ultimately determine corporate policy. (See, e.g., *Hobbs* v. *Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 193 [210 Cal.Rptr. 387] [substantial evidence that office manager "possessed that broad degree of discretion in decision making which determined [the employer's] corporate policy"]; *Siva* v. *General Tire & Rubber Co.* (1983) 146 Cal.App.3d 152, 159 [194 Cal.Rptr. 51] [no punitive damages when evidence did not support claim that management employees had discretion to exceed corporation's written standards for repairs].) In addition, the Ninth Circuit Court of Appeals supports the interpretation we adopt. (See, e.g., *Glovatorium, Inc.* v. *NCR Corp.* (9th Cir. 1982) 684 F.2d 658, 661 [holding that "[t]he key inquiry in the determination of whether an employee is a managing agent is 'the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy' "].)

The legislative history of section 3294, subdivision (b), is also consistent with our construction of "managing agent" and our view that the Legislature intended to limit application of section 3294 to employees who in fact exercise substantial authority over decisions that ultimately determine corporate policy. The bill amending section 3294 was revised several times before the Legislature settled on its final version. (Stats. 1980, ch. 1242, § 1, p. 4217.) As amended by the Senate, the bill provided that ". . . the advance knowledge, ratification, or act of oppression, fraud, or malice must be on the part of a senior executive officer or officers of the corporation in order for it to be liable for [punitive] damages." (Sen. Amend. to Sen. Bill No. 1989 (1979-1980 Reg. Sess.) May 6, 1980.) The Legislature also inserted the term "conscious disregard" in place of the Restatement's "reckless," so that an employer could not be found liable merely for recklessly failing to research a potential employee's background. (See Conf. Amend. to Sen. Bill No. 1989 (1979-1980 Reg. Sess.) Aug. 31, 1980 (Sen.), Aug. 27, 1980 (Assem.); Rest.2d Torts, § 909, p. 467.) The Assembly amended the bill, changing the phrase "senior executive officer or officers" to "agent . . . employed in a managerial capacity," potentially allowing a plaintiff to impute punitive damages to the corporation if the corporate employee "was employed in a managerial capacity" or "[t]he principal or a managerial agent of the principal ratified or approved the act." (Assem. Amend. to Sen. Bill. No. 1989 (1979-1980 Reg. Sess.) July 2, 1980.) But the Legislature rejected the Assembly's attempt to return to the Restatement language. Before the Legislature enacted Senate Bill No. 1989 in late August 1980, a joint conference committee amended the bill to substitute "officer, director, or managing agent" for "agent . . . employed in a managerial capacity." (Conf. Amend. to Sen. Bill No. 1989 (1979-1980 Reg. Sess.), *supra.*)

We therefore conclude that in amending section 3294, subdivision (b), the Legislature intended that principal liability for punitive damages not depend

on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business.

### D.   Was Salla a "Managing Agent"?

Although the Court of Appeal did not review her job functions in detail, it concluded that Salla, the zone manager who fired plaintiff, was his supervisor, and was therefore a managing agent under section 3294, subdivision (b). Under our construction of the term, however, and contrary to the Court of Appeal, Salla's supervision of plaintiff and her ability to fire him alone were insufficient to make her a managing agent. Nonetheless, viewing all the facts in favor of the trial court judgment, we conclude that Salla was a managing agent as we construe the term.

As the zone manager for Ultramar, Salla was responsible for managing eight stores, including two stores in the San Diego area, and at least sixty-five employees. The individual store managers reported to her, and Salla reported to department heads in the corporation's retail management department.

The supervision of eight retail stores and sixty-five employees is a significant aspect of Ultramar's business. The testimony of Salla's superiors establishes that they delegated most, if not all, of the responsibility for running these stores to her. The fact that Salla spoke with other employees and consulted the human resources department before firing plaintiff does not detract from her admitted ability to act independently of those sources. In sum, Salla exercised substantial discretionary authority over vital aspects of Ultramar's business that included managing numerous stores on a daily basis and making significant decisions affecting both store and company policy. In firing White for testifying at an unemployment hearing, Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect of Ultramar's business.

E.  *Conclusion*

Salla was a managing agent under section 3294, subdivision (b), whose conduct could lead to imposing punitive damages on Ultramar. For this reason alone, we affirm the Court of Appeal judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**MOSK, J.**—I concur in the result but write separately to clarify what I understand to be the correct test under Civil Code section 3294, subdivision (b), for determining corporate liability for the acts of a "managing agent."

I

Civil Code section 3294, subdivision (b), in relevant part provides that a corporate employer may be liable for punitive damages based on the wrongful acts of an employee if, with regard to the wrongful conduct, there was "advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice . . . on the part of an officer, director, or managing agent of the corporation."

What is meant by the term "managing agent" under the statute?

As the majority state, we have previously addressed the scope of corporate liability for punitive damages based on the wrongdoing of their employees in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141] (*Egan*) and *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58] (*Agarwal*). I agree that, in construing the term "managing agent" under Civil Code section 3294, we can and should be guided by those precedents.

*Egan* involved a claim against an insurer for breach of an insurance contract based on the failure of two of its employees, a claims manager and a claims analyst, adequately to investigate a claim before denying coverage. We determined that the insurance company might be liable for punitive damages based on the employees' wrongdoing, under the earlier version of Civil Code section 3294, which, like the present version, was enacted with the principal purpose of "discourag[ing] the perpetuation of objectionable corporate policies" (*Egan, supra,* 24 Cal.3d at p. 820).

In *Egan*, we observed that California follows the approach of the Restatement Second of Torts, which states that punitive damages can properly be

awarded against a principal, inter alia, when " 'the agent was employed in a mangerial capacity and was acting in the scope of employment.' " (*Egan*, *supra*, 24 Cal.3d at p. 822, citing Rest.2d Torts (Tent. Draft No. 19, Mar. 30, 1973) § 909 (hereafter sometimes Restatement).) We explained that "the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." (*Egan*, *supra*, 24 Cal.3d at pp. 822-823.)

Responding to the argument that neither employee was involved in " 'high-level policy making,' " we emphasized that "[t]he determination whether employees act in a managerial capacity . . . does not necessarily hinge on their 'level' in the corporate hierarchy." (*Egan*, *supra*, 24 Cal.3d at p. 822.) Corporate liability should turn not on any official title, but rather on the extent of discretion conferred on the employee by the corporation. " 'Defendant should not be allowed to insulate itself from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions.' " (*Id.* at p. 823.) We observed that the two employees possessed broad supervisory and decisionmaking authority regarding the disposition of claims: "The authority exercised by [the two employees] necessarily results in the ad hoc formulation of policy." (*Ibid.*)

In *Agarwal*, the plaintiff was awarded punitive damages against, inter alia, his employer after he suffered mistreatment, including racial harassment, at the hands of his two supervisors. On appeal, the defendants contended that the trial court's jury instruction on employer liability for the willful and malicious torts of its employees failed to distinguish between the employer's compensatory and punitive damage liability. We held that any error was harmless because the authority vested in the supervisors was sufficient to support imposing punitive damages against the corporation. Specifically, they had discretion to assign the plaintiff to menial projects, evaluate his performance, change his office location, deny him permission to attend educational seminars, and fire him on a pretextual reason. It was uncontroverted that they were " 'employed in a managerial capacity' " (one was the manager of project services for the corporation, responsible for 25 to 30 employees in 3 departments, the other his assistant), were directly responsible for supervising Agarwal's performance, and had "the most immediate control over the decision to terminate him." (*Agarwal*, *supra*, 25 Cal.3d at p. 952.)

The rule under both *Egan* and *Agarwal* is thus that a corporation may be liable for punitive damages based on the wrongful conduct of *an employee who exercises substantial discretionary authority over decisions that*

*ultimately determine corporate policy over an aspect of the corporation's business.* Liability turns not on the employee's managerial classification or title, but on the extent of his decisionmaking discretion. In some cases, such as *Agarwal* and the present matter, a supervisory employee with hiring and firing power will qualify as a "managing agent." That does not, however, mean that all supervisors, or all personnel with the power to hire and fire, are ipso facto "managing agents." Nor are all policy makers necessarily "managing agents." Each case must be decided on its facts.[1]

In this matter, Lorraine Salla, the supervisor who made the initial decision to terminate plaintiff in retaliation for testifying at an unemployment compensation hearing, was a "zone manager" responsible for overseeing operations of several convenience stores in the San Diego area. As such, she was not a high-level manager or final policy maker for Ultramar, Inc. (Ultramar)—a large corporation that operates a chain of stores and gasoline service stations throughout California. In effect, she was a local supervisor; indeed, according to the testimony of her supervisors, she apparently lacked the authority to terminate plaintiff without the approval of Ultramar's human resources manager and division manager. Nor did she purport to set any firm-wide or official policy concerning termination of employees for testifying at unemployment hearings. Like the employees in *Egan* and *Agarwal*, however, she exercised authority that "necessarily result[ed] in the ad hoc formulation of policy" that adversely affected plaintiff. (*Egan*, *supra*, 24 Cal.3d at p. 823.) Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another Ultramar employee. A corporate manager with such authority may fairly be deemed a managing agent under Civil Code section 3294, subdivision (b). That conclusion is compelled by the analysis in *Egan*, *supra*, 24 Cal.3d at pages 815-817, and *Agarwal, supra,* 25 Cal.3d at page 952.

---

[1]The Restatement's approach to corporate liability for punitive damages, which we followed in *Egan* and *Agarwal*, has also been adopted in several other jurisdictions. It is viewed as representing the more "conservative" approach as compared with the other rule of vicarious liability for all acts of employees under the doctrine of respondeat superior. (See, e.g., *Matter of P & E Boat Rentals, Inc.* (5th Cir. 1989) 872 F.2d 642, 650 [observing that a majority of the courts impose vicarious liability for punitive damages resulting from the acts of employees, but a number of courts follow the Restatement view]; *Smith's Food & Drug Cntrs.* v. *Bellegarde* (1998) 114 Nev. 602 [958 P.2d 1208, 1214] [adopting the "more conservative" Restatement approach, and finding that a temporary retail store manager who directed the actions of security guard was a "managing agent" whose actions could be imputed to the corporation]; *Dahl* v. *Sittner* (S.D. 1991) 474 N.W.2d 897, 902 [adopting the Restatement approach, noting that the states are almost evenly divided on whether to follow the vicarious liability rule or the more conservative Restatement view].)

## II

As the majority explain, the Legislature, by referring to wrongful acts by an "officer, director, or managing agent" intended to codify *Egan* and *Agarwal.* The Senate bill to amend Civil Code section 3294 had limited corporate liability for punitive damages to wrongdoing of "senior executive officer or officers." The Assembly version substituted the Restatement's phrase, "principal or a managerial agent." The final conference committee version, however, substituted the words "officer" and "director" for the word "principal," and used the term "managing agent."

What was the significance of this final change? "Principal" is simply another term for "officer" and "director." There is no substantive difference between the terms *"managing* agent" and *"managerial* agent"; the word "managerial" means "of, relating to, or characteristic of, a manager," and a "manager" is "one that manages: a person that conducts, directs, or supervises something." (Webster's New Internat. Dict. (3d ed. 1961) p. 1372.) It would thus appear that the ultimate legislative intent was to retain the test under the Restatement Second of Torts section 909—which uses almost identical language in referring to a · "principal or managerial agent"—as articulated in our decisions. This conclusion is supported by contemporaneous legislative materials indicating that the bill's sponsors, and even its opponents, including the California Trial Lawyers Association, believed that it codified rather than narrowed existing law.[2]

---

[2]Thus, a member of the conference committee, with the knowledge of the committee, requested that a letter be published in the Senate Journal regarding the significance of the adoption, in the final version of the bill, of the term "principal or managerial agent." The letter states that its purpose is "to clarify the intent of the Conference Committee and to set forth the representations that were made to [the member] during the Conference Committee by the proponents of the legislation. [¶] The intent of [the bill] as amended in conference . . . with respect to the term 'managing agent' is not to alter the rule of corporate liability for punitive damages as it related to that term in the case of *Egan* . . . ." (Sen. David A. Roberti, letter to Sen. President Pro Tem. James R. Mills (Aug. 28, 1980) 8 Sen. J. (1979-1980 Reg. Sess.) p. 14548.) In letters to individual legislators urging them to vote for the bill, the measure's sponsors represented that the bill "would codify existing case law establishing the liability of employers for the acts of their employees . . . ." (See, e.g., Letter from Association for California Tort Reform, June 23, 1980.) The same understanding is reflected in the Governor's enrolled bill report: "Although the bill is opposed in concept by the California Trial Lawyers Association, *they concede that it does little more than codify existing caselaw.* This was also the clear understanding of the final conference committee." (Governor's Office, Dept. Legal Affairs, Enrolled Bill Rep., Sen. Bill 1989 (1979-1980 Reg. Sess.) p. 1, italics added.)

The only contrary intent is indicated in identical letters authored by two individual legislators, one from the Assembly Speaker Pro Tempore addressed to the Speaker, and another from the bill's author to the Governor urging him to sign the bill. These letters

The Court of Appeal cases in point have uniformly reached a similar conclusion. In particular, *Kelly-Zurian* v. *Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 419-422 [27 Cal.Rptr.2d 457], states that *Agarwal* is consistent with Civil Code section 3294, and recites the Restatement section 909 rule that a corporation may be liable for punitive damages for acts of an agent employed in a "managerial capacity." The Court of Appeal in the present case similarly characterized *Kelly-Zurian*, observing that "*Egan* did not hold that an employee must actually be in a position to directly make policy to be deemed a managing agent," and that *Agarwal* held that supervisors with managerial authority may be managing agents under the statute.

*Siva* v. *General Tire & Rubber Co.* (1983) 146 Cal.App.3d 152, 158-159 [194 Cal.Rptr. 51], is also consistent with our decisions in *Egan* and *Agarwal*. There, an employee brought a products liability claim against his employer arising from a defectively repaired tire. *Siva* explains that a managing agent, as the term is used in section 3294, subdivision (b), "is an individual who has the discretion to act in '. . . a managerial capacity . . . [by] making decisions that will ultimately determine corporate policy.' [Citing *Egan*.]" (146 Cal.App.3d at p. 159.) It determined that the workers who repaired the tire were not acting in a managerial capacity, because there was no evidence they "had the discretion to exceed [the employer's] written standards for repairs of this nature." It then concluded that the plant manager did clearly act in a managerial capacity, because he knew the extent of damage to the tire but failed to follow the company's written standards to correct it, thus creating an "implicit local policy" to disregard the standards. (*Ibid.*) It appears that the plant manager had no authority to create express corporate policy, but he made ad hoc policy by violating those standards.

Other Court of Appeal decisions have also applied the rule in *Egan* and *Agarwal*. (See, e.g., *Weeks* v. *Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1151 [74 Cal.Rptr.2d 510] [citing *Egan* and noting that "we have no doubt that [Civil Code section 3294, subdivision (b),] does no more than codify and refine existing law"]; *Stephens* v. *Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394, 1403 [245 Cal.Rptr. 606] [citing *Agarwal*]; *Pusateri* v. *E. F. Hutton & Co.* (1986) 180 Cal.App.3d 247, 250 [225 Cal.Rptr. 526] [citing *Egan* and *Agarwal*]; *Hobbs* v. *Bateman Eichler,*

---

represent that the bill repudiated the Restatement standard by eliminating the term "managerial capacity" and using "managing agent" instead. Because these letters apparently were not made available to the entire Legislature (see *Quelimane Co.* v. *Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513]), were contradicted by the letter in the Senate Journal representing the intent of the conference committee, and indicate a purpose different from that reflected in the Governor's enrolled bill report, they are entitled to no weight.

*Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 193 [210 Cal.Rptr. 387] [citing *Egan* and *Agarwal*].) For this reason, it would appear that the Legislature's repeated amendments of section 3294 since 1980 (in 1982, 1987, 1988, and 1992), without altering the "managing agent" language of subdivision (b), signifies approval of the judicial construction. (*People* v. *Masbruch* (1996) 13 Cal.4th 1001, 1007 [55 Cal.Rptr.2d 760, 920 P.2d 705] [" 'Where a statute is framed in language of an earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction.' "] (opn. of Chin, J.).)

Ultramar urges that the term "managing agent" should be construed to mean only someone with final policymaking authority akin to that of a very high-ranking corporate director or officer. Like the majority, I reject such a standard as too narrow and too vague; strictly applied, it would appear to absolve a corporate employer of liability in almost every case, particularly a large corporation with many levels of hierarchy.

I also reject any implication that Ultramar could avoid future liability simply by instituting a formal policy against retaliatory firing of its employees; I doubt that is what the Legislature intended in enacting Civil Code section 3294, subdivision (b). Ultramar cites the recent United States Supreme Court decision in *Kolstad* v. *American Dental Assn.* (1999) 527 U.S. 526 [119 S.Ct. 2118, 144 L.Ed.2d 494], urging that it should guide our decision herein. In *Kolstad*, which involved the liability of employers for punitive damages under the federal antidiscrimination statutes, the high court adapted general common law agency concepts in light of the specific objectives of title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). As the majority state, we have no occasion to consider to what extent those same objectives might be relevant in this, or any hypothetical, case under Civil Code section 3294. But in no event should a corporation be permitted to shield itself from liability by the expedient of a having a pro forma official policy—issued by high-level management—while conferring broad discretion in lower-level employees to implement company policy in a discriminatory or otherwise culpable manner. It is what the company *does*—including through the discretionary acts of its employees—not just what it *says* in a stated or written policy, that matters.[3]

As in *Egan* and *Agarwal*, regardless of any stated or written official policy by Ultramar, Salla had sufficient discretion to take actions that necessarily

---

[3]Indeed, the record indicates that it was a violation of Ultramar's "company policy" to retaliate against employees who testified at unemployment compensation hearings.

resulted in the ad hoc formulation of policy over the aspect of the corporation's business giving rise to plaintiff's cause of action. For that reason, in my view she may fairly be treated as a managing agent for Ultramar. On this basis, I would affirm the judgment against Ultramar.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied October 27, 1999.