**Yvonne REID, Plaintiff,**

v.

**SMITHKLINE BEECHAM CORPO-RATION, dba Glaxosmithkline, Defendant.**

**No. 03–CV–1780 W(BLM).**

United States District Court, S.D. California.

April 11, 2005.

Mark J. Butler, Newport Beach, CA, Mark N. Mazda, Irvine, CA, for Plaintiff.

Meryl C. Maneker, San Diego, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

WHELAN, District Judge.

On July 18, 2003 Yvonne Reid ("Plaintiff" or "Reid") commenced this employment action in San Diego Superior Court. Shortly thereafter, Defendant Glaxosmithkline ("Defendant" or "GSK") removed the action to federal court. Currently pending before the Court are the parties' cross-motions for summary judgment. The Court decides the matter on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d.1). For the reasons stated below, the Court **DENIES** Plaintiff's summary judgment motion and **GRANTS** in part and **DE-** NIES in part Defendant's summary judgment motion.

### I. BACKGROUND

Plaintiff began working for GSK on January 2, 1989 as a pharmaceutical sales representative in Oklahoma. Sometime in 1993, GSK transferred Plaintiff to San Diego where she worked in various divisions and positions. In September 2002 GSK assigned Plaintiff to GSK's Oncology Division as a Senior Executive Oncology Account Manager for Acute Care where she would be responsible for selling four drugs: Zofran, Argatroban, Navelbine and Hycamtin. Plaintiff's assignment was effective immediately, but GSK expected transfers to its Oncology Division to continue working in their previous positions for three months while they underwent the necessary training for their new positions.

In October 2002 Reid informed GSK's Employee Response Center[1] that she was pregnant and that she anticipated she would need to take leave beginning in January 2003. In November 2002 GSK conducted a two and a half week training program on Hycamtin and Navelbine for transfers to the Oncology division. Because she was pregnant, Reid did not attend this training. On December 1, 2002 Reid took over as Senior Executive Oncology Account Manager. Approximately one month later, she began her twelve weeks of maternity leave.

Reid returned from maternity leave on March 31, 2003. Three days after Reid returned to work, her immediate supervisor, Scott Barnes ("Barnes"), informed her of a training session in Philadelphia on Hycamtin and Navelbine scheduled for May 6 through 21. Reid responded that it was impossible for her to attend the training because she had an eleven week old

---

**1.** GSK's Employee Response Center is apparently a kind of clearinghouse for employee requests regarding, among other things, various types of leave.

infant. Reid reiterated this to Barnes several days later in an email message, stating that "due to the fact that I have an eleven week old infant presents a number of issues which make it impossible for me to attend this training." (*Declaration of Yvonne Reid,* Ex. A).

Several days later, while at a training meeting for the launch of a new drug, Barnes informed Reid that she was required to attend the Philadelphia training. Reid again told Barnes that she would not be able to attend the training because of her newborn child and again asked to be excused from the training. (*Deposition of Yvonne Reid* at 143:5–19). In response, Barnes told Reid that "they feel you have already had enough time off." (*Deposition of Scott Barnes* at 143:13–15).

Over the next several weeks, GSK personnel attempted to work with Reid to address her concerns regarding attending the Philadelphia training. GSK offered to (1) allow Reid to bring her son and his caregiver to Philadelphia; (2) allow Reid to take as many lactation breaks as needed during the training day; (3) allow her to use the lactation rooms at the training site; (4) pay for a larger hotel room to accommodate childcare; (5) provide a refrigerator to store milk; and (6) provide a replacement caregiver at a discount if Reid elected not to bring her son's normal caregiver. (*Reid Depo.,* Ex. 19). GSK also offered to cut Reid's expected training time from 17 to 7 days and to move her final videotape role play for the Hycamtin class from May 12th to May 9th. (*Declaration of Bruce Rosvold* ¶¶ 18–20).

When despite these accommodations Reid still indicated that she would not attend the training, GSK informed her on May 2, 2003, via a memo from a Human Resources Manager named Mary Kate Harkins ("Harkins"), that if she failed to attend the Philadelphia training GSK would assume she was voluntarily resigning from her job. (*Reid Decl.,* Ex. C). Reid immediately responded to Harkins via email that she was not resigning and requested that she be notified in writing if GSK would terminate her for failing to attend the training. (*Reid Decl.,* Ex. D). Despite receiving this email message, Harkins never responded to it. (*Deposition of Mary Kate Harkins* at 236:21–238:9). Nor did anyone else from GSK advise Reid that she would be terminated for not attending the Philadelphia training until she was actually terminated. (*Reid Decl.* ¶ 43).[2]

On May 7, several days into the training, Harkins called Barnes and told him to set up a conference call for May 9 between the two of them and Reid. (*Barnes Depo.* 154:8–156:1; 160:9–164:5; 165:12–17, Ex. 2). During this May 7 call, Harkins told Barnes that the purpose of the May 9 call was to inform Reid that she was being terminated for job abandonment. *Id.* According to Harkins, GSK could terminate Reid for job abandonment on May 9 because as of that date she would have missed the required five consecutive days of work. *Id.* On May 9, 2003 Harkins and Barnes informed Reid that she was being terminated for abandoning her job. (*Reid Decl.* ¶ 47).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* FED.R.CIV.P. 56(c);

---

**2.** Defendant has objected that this evidence is not relevant and that it contradicts other evidence in the case. *See* (*Defendant's Objections* at ¶ 34). The Court respectfully disagrees.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is appropriate when a party cannot meet an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1103 (9th Cir.2000).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must not weigh the evidence, draw legitimate inferences or make credibility determinations in evaluating a motion for summary judgment. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### III. Discussion

Defendant moves for summary judgment against all of Plaintiff's causes of action. As an initial matter, the Court notes that Plaintiff has abandoned her fifth, seventh and eighth causes of action. *See (Plaintiff's Opp'n* at 8 n. 8). The Court construes this as consent to the merits of Defendant's motion and accordingly **GRANTS** Defendant's motion for summary judgment as to Plaintiff's fifth, seventh and eighth causes of action. *See* Civil Local Rule 7.1(f.3.c).

### A. Plaintiff is Entitled to Present her Breach of Implied Employment Contract Claim to a Jury

Defendant contends that summary judgment is appropriate on Plaintiff's breach of implied employment contract claim because Plaintiff's signed employment application contains an express provision providing that Plaintiff's employment was at will. Defendant argues that such an express provision in an employment application cannot be overcome by any course of conduct evidence to the contrary. Plaintiff does not dispute that under California law an at-will provision in an express written agreement between the parties cannot be overcome by evidence of an implied contrary understanding, nor could she. *See e.g. Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 340 n. 10, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000). Instead, Plaintiff counters that under California law only a signed, written *agreement,* not merely an employment application like the one at issue in this case, is entitled to such a presumption.

California law on this issue is far from settled. On the one hand, some California cases hold that at-will provisions in an employment application are a partially integrated contract, that is the at-will provisions in the employment application represent the parties' final agreement as to that term of the ultimate employment contract. *See McLain v. Great American Ins. Companies,* 208 Cal.App.3d 1476, 1484–1485, 256 Cal.Rptr. 863 (1989) (examining circumstances surrounding the execution of the employment application to determine if it was integrated regarding the at-will provision); *Wagner v. Glendale Adventist Med. Ctr.,* 216 Cal.App.3d 1379, 1387, 265 Cal.Rptr. 412 (1989) (holding that while an employment application "cannot, in and of itself, be an integration ... the parties may have intended the 'at-will' provision to be the final and complete expression of one term, incorporated into the contract of employment they ultimately concluded."). Other cases, however, hold that employment applications are not integrations but

are instead merely solicitations for an offer of employment. *Harden v. Maybelline Sales Corp.,* 230 Cal.App.3d 1550, 1555–1556, 282 Cal.Rptr. 96 (1991).

■ Here, it is clear that under either line of cases the at-will provision in Plaintiff's employment application does not preclude her from introducing proof of an implied contrary understanding. Plaintiff's employment application provides that: "I further understand that *this employment application and any other company documents are not contracts of employment,* and that any individual who is hired may voluntarily leave employment upon proper notice, and may be terminated by [GSK] at any time and for any reason." (*Reid Depo.,* Ex. 2) (emphasis supplied). Unlike the cases cited above which hold that an employment application can be an integration as to an at-will provision, the terms of the employment application at issue here expressly provide that the parties are not entering any kind of employment contract, at-will or otherwise. *See e.g. Wagner,* 216 Cal.App.3d at 1383, 265 Cal.Rptr. 412 (employment application contained a statement that "I understand that if I am employed, ... the employment may be terminated by either party at will upon two weeks' notice to the other."). Plainly the parties did not intend Reid's employment application's at-will term to be a "final and complete expression of one term, incorporated into the contract of employment they ultimately concluded." *Id.* As it does not constitute an express agreement, the at-will provision in Plaintiff's employment application does not bar Plaintiff from presenting evidence of an implied employment contract to terminate only for good cause.

■ Nor does the at-will provision in GSK's employee handbook change this result. Although there is some dispute regarding whether Reid ever received this handbook, there is no dispute that she never signed the acknowledgment form provided. (*Reid Decl.* ¶ 56). While at-will policies unilaterally disseminated by an employer may be evidence of the parties' understanding regarding the employment relationship, unsigned they cannot constitute an express agreement so as to foreclose proof regarding an implied understanding that the employee would not be terminated without cause. *See Guz,* 24 Cal.4th at 340, 100 Cal.Rptr.2d 352, 8 P.3d 1089. Moreover, GSK's handbook, like the employment application, expressly states that "this handbook is not meant to create a contract between [GSK] and its employees." (*Harkins Decl.,* Ex. A); *see also* (*Harkins Decl.,* Ex. C, D, E). The handbook further provides that "the policies and procedures summarized in this handbook are subject to change at the company's discretion with or without notice to employees." (*Harkins Decl.,* Ex. A); *see also* (*Harkins Decl.,* Ex. C, D, E); *McLain,* 208 Cal.App.3d at 1485, 256 Cal. Rptr. 863 (holding that language providing that terms of an agreement could be changed at any time stripped the agreement's at-will provision of its force). On these facts this Court cannot hold that as a matter of law the parties had an express agreement for at-will employment. The Court therefore turns to examine whether Plaintiff has met her burden of proof to overcome the general presumption under California law that employment is at-will.

■ Where there is no express agreement providing that employment is at-will, an employee can rebut the general at-will employment presumption by proving an implied contract to the contrary. CAL. LABOR CODE § 2922; *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 675, 254 Cal. Rptr. 211, 765 P.2d 373 (1988). To determine whether an implied contract exists, courts examine "the totality of the circum-

stances" surrounding the parties' course of conduct. *Foley*, 47 Cal.3d at 681, 254 Cal. Rptr. 211, 765 P.2d 373. Relevant factors include (1) length of service; (2) actions or communications by the employer reflecting assurances of continued employment; (3) the employer's personnel policies and practices; (4) whether the employee gave independent consideration for the employer's promise; and (5) practices in the industry in which the employee is engaged. *Foley*, 47 Cal.3d at 680–81. Normally, whether a contract not to terminate for good cause can be implied from the parties' course of conduct is an issue left for the jury. *Foley*, 47 Cal.3d at 682, 254 Cal.Rptr. 211, 765 P.2d 373.

 Weighing these factors, it is clear that there is a genuine issue of material fact regarding whether GSK impliedly agreed not to terminate Plaintiff without good cause. Plaintiff worked for GSK for over 14 years and declared, under the penalty of perjury, that she was expressly told by her supervisors that she would not be terminated without cause. (*Reid Decl.* ¶¶ 4, 58); (*Reid Depo.* at 31:3–24) ("it was implied to me through statements that I would have a job with Glaxo for as long as I wanted.").[3] Moreover, GSK's practice is not to terminate without cause. (*Harkins Depo.* at 303:15–17).[4] Weighing this evidence with GSK's evidence that Reid's employment was at will, the Court concludes that there is an issue of material fact regarding whether there was an implied employment contract between GSK and Reid that is best left to the jury.

GSK nevertheless contends that it is entitled to judgment as a matter of law on this cause of action because even if there was an agreement not to terminate without good cause, GSK terminated Reid for her failure to show up at the Philadelphia training, which constitutes good cause. As discussed more fully below in connection with Reid's third and fourth causes of action for interference with her Federal and State leave law rights, the circumstances surrounding her termination preclude summary judgment on this basis. Since the Court concludes below that Reid has presented a triable issue of fact regarding whether her termination resulted from her taking protected leave, it cannot be said that she was terminated for good cause as a matter of law. Accordingly, Defendant's motion for summary judgment on Plaintiff's first cause of action is **DENIED**.

**B. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SECOND CAUSE OF ACTION.**

The parties have filed cross-motions for summary judgment regarding Plaintiff's second cause of action for interference with her right to take leave under the California Family Rights Act ("CFRA"). Plaintiff claims that she is entitled to summary judgment because she was qualified to take CFRA leave, requested such leave and GSK denied it. Defendant claims, among other things, that Plaintiff did not make a request for CFRA-qualifying leave because she did not ask for time off from

3. Although GSK has objected to paragraph 58 of Reid's declaration, its objections are unfounded. First, any statements Reid's supervisors made to her regarding her job security are *by definition* not hearsay. *See* FED. R. EV. 801(d)(2) (statements made by a party offered against that party are not hearsay). Second, the Court sees no conflict between Reid's statement in her declaration that she was told

she would not be terminated without good cause and her deposition testimony that it was implied to her that she would have a job as long as she wanted.

4. To the extent terms in GSK's handbook contradict Ms. Harkins' statements, the Court notes that the handbook's terms provide that they were subject to change without notice.

work but instead simply requested to be excused from the Philadelphia training. The Court agrees.

CFRA provides that employees may take unpaid leave for a variety of reasons, including up to 12 weeks of leave because of the birth of the employee's child. CAL. GOV'T CODE §§ 12945.2(a), 12945.2(c)(3)(A). Although employees are not required to take all 12 weeks of leave at once, they may only take leaves of less than two weeks' duration on two occasions. *See* 2 CAL.CODE OF REGS. § 7297.3(d).[5]

It is undisputed that GSK is covered by CFRA and that Plaintiff was eligible for additional unpaid CFRA leave at the time she contends she requested it. However, it is clear from the record that Plaintiff never requested time off from work because of her newborn child. Rather, Plaintiff simply requested to be excused from the Philadelphia training because she had a newborn child and apparently did not want to travel. *See* (*Plaintiff's Mot.* at 12) ("Ms. Reid immediately responded by telling Mr. Barnes that she was unable to attend the May 2003 training in Philadelphia because her infant son North was only three months old"); (*Reid Decl.*, Ex. A) (email message from Reid to Barnes dated April 4, 2003) ("I would like to attend this meeting, however due to the fact that I have an eleven week old infant presents a number of issues which make it impossible for me to attend this training."); (*Reid Depo.* at 143:12–19) ("Q. Did you ask for a particular amount of leave? A. The weeks of the training. I didn't ask for a specific time, but I asked to be excused from the training. Q. So you just asked to

have leave for the two weeks that the training was slated for? A. I asked to just take leave from the training—."). Indeed, Reid testified that had Barnes told her she did not need to attend the Philadelphia training she would have worked in San Diego the week of the training and, according to her declaration, did in fact work that week. (*Reid Depo.* 248:16–24); (*Reid Decl.* ¶ 46).

■ Taking all of these facts together, no reasonable jury could conclude that Reid was requesting unpaid time off from *work* as opposed to simply being excused from the Philadelphia training. Thus, the question becomes whether an employee's request to be excused from training, but not to take unpaid time off work, due to the birth of an employee's child constitutes a request for leave protected by CFRA. For the following reasons the Court concludes that it does not.

Although the term "family care and medical leave" is defined by CFRA to include leave for the birth of a child, the term "leave" itself is not defined by CFRA. *See* CAL. GOV'T CODE § 12945.2. The parties have not directed the Court to any California authority interpreting the meaning of "leave" as used in CFRA nor has the Court's own independent research uncovered any. Thus, the Court must turn to principles of statutory interpretation to determine what the California legislature meant when it used the term "leave" in CFRA.

■ When interpreting a California statute, federal courts must look to Cali-

---

**5.** Although Plaintiff contends that a CFRA eligible employee may take reduced schedule leave for the birth of his or her child, the Court's reading of the CFRA's implementing regulations does not support Plaintiff's assertion. While a CFRA eligible employee may take reduced schedule leave for the employ-

ee's, parent's or child's serious health condition, leaves for reason of a child's birth are strictly limited and do not include reduced schedule leave. *Compare* 2 CAL.CODE OF REGS. § 7297.3(d); 2 CAL CODE OF REGS. § 7297.3(e)(1) (reduced schedule leave allowed for serious health conditions).

fornia principles of statutory construction. *Neilson v. Chang (In re First T.D. & Investment, Inc.)*, 253 F.3d 520, 527 (9th Cir.2001). California statutory construction principles require courts to " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law' " by first looking at the statute's words. *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 32 Cal.4th 1029, 1043, 12 Cal.Rptr.3d 343, 88 P.3d 71 (2004) (citations omitted). Unless the Legislature has defined the statute's terms, their ordinary meaning prevails. *Sec. Pac. Nat'l Bank v. Wozab*, 51 Cal.3d 991, 998, 275 Cal.Rptr. 201, 800 P.2d 557 (1990). "It is axiomatic that in the interpretation of a statute where the language is clear, its plain meaning should be followed." *Id.* (internal quotations and citations omitted). However, this general rule "does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute." *Lungren v. Deukmejian*, 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299 (1988).

"Leave" is commonly defined as "[o]fficial permission to be absent from work or duty, as that granted to military or corporate personnel" or "[t]he period of time granted by such permission." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000). Likewise, Black's Law Dictionary defines "leave" as an "[e]xtended absence for which one has authorization" and "leave of absence" as "[a] worker's temporary absence from employment or duty with the intention to return." BLACK's LAW DICTIONARY (8th ed.2004). Thus, "leave," as it is commonly used, connotes an absence or time off from work, not merely exemption from certain job requirements. The plain meaning of the word "leave" therefore suggests that the protections afforded by CFRA for "leave" due to the birth of an employee's child extend only to actual requests for time off from work.

This construction is supported by examining CFRA's remaining provisions. The fact that CFRA specifically provides that leave taken under its auspices is unpaid and may not exceed twelve weeks supports construing the statute to require an employee to actually request time off from work for the request to constitute CFRA-qualifying leave. CAL. GOV'T CODE § 12945.2(a), (d). Construing the statute to require employers to accommodate employee requests short of actually taking time off from work raises the question of how such accommodations would be valued and correspondingly deducted from an employee's paycheck, as CFRA leave is unpaid, or how they would be counted towards the employee's maximum twelve weeks of CFRA leave. Absent provisions in the statute addressing such issues, it is clear that the California legislature could not have intended CFRA leave to encompass employee accommodation requests short of time off from work. Any other construction would create a host of problems interpreting and applying the remainder of the statute. *See Lungren*, 45 Cal.3d at 735, 248 Cal.Rptr. 115, 755 P.2d 299 (statutory provisions should be read consistently with other portions of the statute).

Moreover, CFRA's implementing regulations, which strictly limit the manner in which an employee may take leave because of the birth of his or her child, also support this construction. *See* 2 CAL.CODE OF REGS. § 7297.3(d). These regulations require the employee to generally take leave in minimum two week blocks and omit any reference to the reduced schedule leave provided for other types of CFRA leave. *Id.* Such strict requirements are inconsistent with the flexible concept of CFRA leave as

encompassing employee accommodation requests short of actual time off from work. As Plaintiff only requested to be excused from the Philadelphia training, not for time off from work, Defendant's motion for summary judgment on Plaintiff's second cause of action must be **GRANTED** and Plaintiff's cross motion **DENIED**.

### C. Defendant's Motion for Summary Judgment on Plaintiff's Third and Fourth Causes of Action for Retaliation and Discrimination for Taking Protected Federal and State Leave Must be Denied.

In her third and fourth causes of action Plaintiff claims that Defendant retaliated and discriminated against her by terminating her for taking leave protected by the Family Medical Leave Act ("FMLA") and for taking and requesting additional protected leave under California law. Defendant contends that it is entitled to summary judgment against Plaintiff's third and fourth causes of action because she cannot show any discriminatory animus, she was not terminated for taking leave but for failing to show up for training and she cannot show that the reason GSK proffers for her termination was pretextual. The Court disagrees.

Although Plaintiff has styled her third and fourth causes of action as retaliation claims, they are more properly analyzed as interference causes of action because her claim is essentially that GSK terminated her for taking and requesting additional

protected leave. *See Liu v. Amway Corp.,* 347 F.3d 1125, 1135 (9th Cir.2003) (holding that "the statutory and regulatory language of FMLA makes clear that where an employee is subjected to negative consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights.") (internal quotations omitted).[6] "In contrast, where an employee is punished for *opposing* unlawful practices by the employer, the issue then becomes one of discrimination and retaliation." *Liu,* 347 F.3d at 1135 (emphasis in original). Thus, the *McDonnell Douglas* burden shifting analysis upon which Plaintiff relies is inappropriate in this case. *Id.; McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ "Where an employee alleges that his or her FMLA leave is impermissibly considered in the decision to terminate him or her, this Circuit applies the standard set forth by the [Department of Labor] in 29 CFR § 825.220(c)." *Liu,* 347 F.3d at 1135. An employee may therefore prove her claim that her employer interfered with her right to take protected leave by proving

> by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both.

---

**6.** California courts generally follow FMLA statutes and regulations for guidance in interpreting claims based on California's analogous leave laws. *Mora v. Chem–Tronics, Inc.,* 16 F.Supp.2d 1192, 1202–03 (S.D.Cal.1998) (Jones, J.). As the parties have not directed this Court to a different standard for Plaintiff's State law claims, the Court will apply this Circuit's FMLA standard to both Plaintiff's Federal and State claims that she was

terminated for exercising her right to take protected leave. *See Liu,* 347 F.3d at 1132 n. 4, 1136 (applying FMLA interference standard to employee's claims that she was terminated for exercising both her right to FMLA leave and her right to leave protected by California law). **The Court will also refer to FMLA leave for the remainder of this order with the understanding that it includes California's analogous leave laws.** *Id.*

*Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir.2001). Thus, if there is a triable issue of material fact regarding whether GSK impermissibly considered Plaintiff's FMLA leave when terminating her, summary judgment is inappropriate.[7]

■ Here, Plaintiff has provided enough evidence that GSK considered the fact that she had taken FMLA leave when it terminated her to survive summary judgment. Approximately one week after Plaintiff returned from leave her immediate supervisor informed her, in response to her request to be excused from training in Philadelphia, that "they feel you have already had enough time off." (*Barnes Depo.* at 143:13–15). Although Barnes explained that he meant Reid had already had enough time off from training, he did not testify that he told Reid that and it is certainly not the only inference a jury could draw from Barnes' statement. (*Barnes Depo.* at 141:22–143:15). About five weeks after Reid returned from leave and approximately one month after Barnes' statement, GSK terminated Reid claiming that she had voluntarily resigned and abandoned her job. (*Reid Decl.* ¶ 47). This close proximity between Reid's return from leave, Barnes' statement and her termination gives rise to an inference of a causal connection. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir.1998) ("close temporal proximity between two events may give rise to an inference of causal connection.").

Moreover, it appears that there may have been more to GSK's job abandonment explanation when events surround Reid's termination are examined.[8] Reid specifically asked GSK human resources personnel via email before the Philadelphia training started to notify her in writing if she would be terminated if she did not go to the training. (*Harkins Depo.* at 232:3–238:9, 241:4–7, Ex. 4). Despite receiving this email, GSK never notified Reid in writing that she would be terminated for failing to attend the training. *Id.* Instead, GSK human resources personnel contacted Reid's immediate supervisor, Barnes, two days before the training ended and told him to set up a conference call with Reid for the day the training ended because at that point GSK could tell Reid that they were terminating her for job abandonment. (*Barnes Depo.* at 154:8–156:1, 160:9–164:5; 165:12–17, Ex. 2). Thus, a jury could reasonably conclude that even though GSK knew that it would terminate Reid if she failed to show up by the end of the Philadelphia training two days *before* the training ended, and Reid had specifically asked to be informed in writing if she would be terminated for failure to attend the training, GSK did not tell her until it terminated her.

Drawing all inferences from these facts in favor of Plaintiff, as the Court must on this summary judgment motion, it is clear

---

7. The Court notes that the portion of Plaintiff's fourth cause of action which relies on her request for additional CFRA "leave" is foreclosed by this Court's ruling above that Plaintiff's request did not constitute a request for CFRA-qualifying leave. Thus, the Court considers Plaintiff's third and fourth causes of action only in light of the leave that Plaintiff had already taken when GSK terminated her.

8. The parties spend a great deal of time arguing whether GSK's reason for terminating Reid was or was not pretextual. However, this Court sees nothing in the standard set forth in *Bachelder* that requires the employee to demonstrate that the employer's stated termination reason was pretextual. Rather, the pretext standard derives from discrimination cases, which do not apply to FMLA interference claims. *See Liu*, 347 F.3d at 1136–37 (analyzing FMLA interference claim without reference to "pretext").

that Plaintiff has presented a triable issue of material fact regarding her third and fourth causes of action. The proximity between Reid's termination and her protected leave as well as the circumstances surrounding that termination suggest that GSK may have considered her FMLA leave when deciding to terminate her employment. Accordingly, Defendant's motion for summary judgment on Plaintiff's third and fourth causes of action must be **DENIED.**

### D. Plaintiff's Wrongful Termination in Violation of Public Policy Claim

Defendant also contends that it is entitled to summary judgment on Plaintiff's wrongful termination in violation of public policy claim because it is entitled to summary judgment on all of the claims Reid has alleged in support of her sixth claim. Plaintiff counters that she has sufficiently stated underlying violations of her rights to support her termination in violation of public policy claim. The Court agrees.

■■■■ To prevail on a claim for termination in violation of public policy an employee must show (1) an employer-employee relationship; (2) termination of employment; (3) the termination was a violation of public policy; (4) the termination was the legal cause of the plaintiff's damages; and (5) damages. *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 172, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980). Here, the parties' only dispute is whether Plaintiff has sufficiently established an underlying violation to support her contention that her termination was in violation of public policy and a causal link between that violation and her termination. As discussed above, Plaintiff has presented sufficient evidence in support of her third and fourth causes of action for termination in violation of her rights under Federal and state leave laws. In presenting that evidence, Plain-

tiff has also shown a sufficient causal connection between her taking leave and her resulting termination. Accordingly, Defendant's motion for summary judgment against Plaintiff's *Tameny* claim must be **DENIED.**

However, because the Court has concluded that Plaintiff's request to be excused from the Philadelphia training was not a request for CFRA-qualifying leave, the violation alleged in Plaintiff's second cause of action cannot support her *Tameny* claim. Plaintiff's cross motion for summary judgment on this claim, asserted in a footnote to Plaintiff's opposition, must therefore be **DENIED.**

### E. Defendant is Entitled to Summary Judgment on Plaintiff's Punitive Damages Claim Because She has Failed to Produce Sufficient Evidence of Malice

■■■■ Plaintiff claims that she is entitled to pursue punitive damages for her third through sixth causes of action. As a threshold matter, the Court notes that punitive damages are not available for Plaintiff's third cause of action, GSK's alleged violation of her FMLA rights. *See Liu,* 347 F.3d at 1133 n. 6 ("The FMLA only provides for compensatory damages and not punitive damages."). Likewise, Plaintiff has abandoned her fifth cause of action and this Court has granted summary judgment in favor of Defendant on that basis. Thus, punitive damages, if available at all, may only be awarded for Plaintiff's fourth and sixth causes of action.

Defendant contends that Plaintiff is not entitled to punitive damages because she has not sufficiently demonstrated that GSK was guilty of oppression, malice or fraud. Plaintiff counters that she has presented sufficient evidence to take her punitive damages claim to a jury because she has demonstrated that GSK's managing

agents interfered with her rights to take leave under Federal and State leave laws by terminating her for taking that leave. The Court disagrees.

■ To prevail on a punitive damages claim against a corporate employer a plaintiff must prove by clear and convincing evidence that the employer was guilty of oppression, malice or fraud. CAL. CIV.CODE § 3294; *White v. Ultramar, Inc.*, 21 Cal.4th 563, 88 Cal.Rptr.2d 19, 981 P.2d 944 (1999); *Basich v. Allstate Insurance*, 87 Cal.App.4th 1112, 1121, 105 Cal.Rptr.2d 153 (2001). This higher standard applies at all stages of the proceeding, including at summary judgment. *Adams v. Allstate Ins. Co.*, 187 F.Supp.2d 1219, 1231 (C.D.Cal.2002). When dealing with a corporate employer, a plaintiff must also show that the employer's officer, director or managing agent had advance knowledge of the oppressive, malicious or fraudulent act and consciously disregarded, authorized or ratified it. CAL. CIV.CODE § 3294(b).

■ Here, although Plaintiff has presented sufficient evidence to try her fourth and sixth causes of action to a jury because she has raised sufficient facts to allow a jury to conclude she was terminated for taking protected leave, she has fallen well short of presenting clear and convincing evidence that Defendant's managing agents acted with malice in terminating her employment. Plaintiff has identified two managing agents she claims either acted with malice towards her, ratified or disregarded the conduct of another: Barnes and Julie Murray ("Murray"), GSK's Vice President of Sales for its On-

cology and Acute Care unit. However, Barnes did not make the decision to fire Plaintiff and indeed testified that he had nothing whatsoever to do with that decision so his actions cannot support a punitive damages award. (*Barnes Depo.* at 159:13–18) ("Q. So were you part of the decision-making process as to this determination that Ms. Reid's employment was going to be terminated? A. No. Q. Not at all? A. Nope."); *See e.g. Ultramar*, 21 Cal.4th at 577, 88 Cal.Rptr.2d 19, 981 P.2d 944 (examining actions and status of the person responsible for making the termination decision).

And while Barnes' statement that "they feel you have already had enough time off" may lead to an inference that those at GSK who did make the termination decision improperly considered Reid's FMLA leave in terminating her, this evidence falls well short of the clear and convincing evidence standard that Plaintiff must meet. Barnes did not attribute the statement to any particular person at GSK let alone a managing agent. (*Barnes Depo.* at 143:13–21).[9] Instead, it is clear from his testimony that he was merely summarizing the "feeling" of the group. (*Barnes Depo.* at 142:11–143:21, 146:10–147:1). This evidence is insufficient to support Plaintiff's punitive damages claim.

Nor has Plaintiff produced any evidence that Murray, the person responsible for making the decision to terminate Plaintiff, personally acted with oppression or malice towards her or consciously disregarded or ratified such conduct by any other employee.[10] (*Murray Depo.* at 35:10–16) (testify-

---

**9.** Barnes attributed this statement to Harkins, Charlie Flannery and Murray. Of those three, Murray is the only one Plaintiff contends was a managing agent.

**10.** The Court notes that the only actions Plaintiff has identified that could possibly support a punitive damages award were those of

Harkins. As Plaintiff does not contend that Harkins was a managing agent or that another managing agent ratified Harkins' actions discussed above, Plaintiff cannot rely on them to secure punitive damages. CAL. CIV.CODE § 3294.

ing that she made the ultimate decision to terminate Reid). Plaintiff has not directed the Court to any deposition testimony from *Murray* that raises any inference that Murray decided to terminate Plaintiff because she had previously taken leave or *consciously* disregarded or ratified another's decision to that effect and the Court respectfully declines to independently search her 375–page deposition for any such testimony. *See Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir.2001) ("The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (the court is not obligated "to scour the record in search of a genuine issue of triable fact.").

Accordingly, the Court concludes that Plaintiff's punitive damages claim fails as a matter of law. Defendant's motion for summary judgment on Plaintiff's punitive damages claim is therefore **GRANTED**.

#### IV. CONCLUSION AND ORDER

In light of the foregoing, the Court **GRANTS** in part and **DENIES** in part Defendant's motion for summary judgment. (Doc. No. 23–1, 23–2). The Court **DENIES** Plaintiff's cross motion for summary judgment on her second cause of action. (Doc. No. 27–1). Insofar as the Court has relied on evidence to which Defendant has objected, Defendant's evidentiary objections are **OVERRULED** for the reasons discussed above. (Doc. No. 67–1). The remainder of Defendant's evidentiary objections are **DENIED** as moot.

**IT IS SO ORDERED.**