[No. H034853. Sixth Dist. Aug. 19, 2010.]

MILPITAS UNIFIED SCHOOL DISTRICT, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and JOYCE
GUZMAN, Respondents.

**COUNSEL**

Bradford & Barthel, Donald R. Barthel and Louis A. Larres for Petitioner.

Finnegan, Marks, Theofel & Desmond and Ellen Sims Langille for the California Chamber of Commerce as Amicus Curiae on behalf of Petitioner.

David M. Skaggs for Pacific Compensation Insurance Company as Amicus Curiae on behalf of Petitioner.

Vanessa L. Holton, Steven A. McGinty and Jesse N. Rosen for John C. Duncan, Director of Industrial Relations, as Amicus Curiae on behalf of Petitioner.

Saul Allweiss and Michael A. Marks for California Workers' Compensation Institute and American Insurance Association as Amici Curiae on behalf of Petitioner.

Adam M. Cole, Richard G. Krenz and Christopher Citko for Steve Poizner, California Insurance Commissioner, as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent Workers' Compensation Appeals Board.

J. Bruce Sutherland and Carla Spencer for Respondent Joyce Guzman.

Capurro, Rocha & Schmidt and Joseph V. Capurro for California Applicants' Attorneys Association as Amicus Curiae on behalf of Respondents.

David Bryan Leonard for California Society of Industrial Medicine & Surgery, Inc., as Amicus Curiae on behalf of Respondents.

## OPINION

**ELIA, J.**—In this original proceeding the Milpitas Unified School District (District) challenges a decision of the Workers' Compensation Appeals Board (WCAB or Board) applying Labor Code section 4660[1] to the disability evaluation of a District employee. The Board ruled that (1) an employee's impairment may be determined by reference to any applicable portion of the American Medical Association's Guides to the Evaluation of Permanent Impairment (5th ed.) (Guides), and (2) this determination may be used to rebut the rating of permanent disability established by the 2005 Schedule for Rating Permanent Disabilities (PDRS or Schedule). This court granted the District's petition for review. We conclude that the language of section 4660 permits reliance on the entire Guides, including the instructions on the use of clinical judgment, in deriving an impairment rating in a particular case. We will therefore affirm the Board's decision.

### Background

Joyce Guzman worked for the District as a temporary employee beginning in October 2001 and as a permanent employee, a secretary/clerk, from

---

[1] All further statutory references are to the Labor Code except as otherwise specified.

September 2002 to May 2005. The District was permissibly self-insured for workers' compensation liability; Keenan & Associates was its workers' compensation adjuster.

On November 5, 2003, Guzman's right foot became entangled in some computer wires under her desk, and as she rose and turned away, she fell. Over the following two and a half years, she sought treatment for pain in various locations on her body, as well as for psychiatric symptoms that led to prescriptions for antidepressants. Unsatisfied with the tests and recommendations of her Kaiser Permanente physicians, she turned to her attorney, who referred her to Dr. Fatteh. He diagnosed degenerative disc disease and prescribed physical therapy, a home muscle stimulator (for back spasms), chiropractic, and acupuncture. Gradually, Guzman progressed from modified work hours to an eight-hour workday "with restrictions." A flareup in May 2005 resulted in Dr. Fatteh's finding of a month-long total disability. On June 1, 2005, Dr. Fatteh noted Guzman's reduction in back and neck pain. While awaiting authorization for her to see a psychologist, she was to remain off work until August 1, 2005.

By September 2005 Dr. Fatteh reported that Guzman had experienced increased neck and low back pain, and he did not believe she would be able to return to her usual work. He recommended further psychotherapy and vocational rehabilitation, while predicting that Guzman would become "permanent and stationary" within three months.[2]

Guzman filed her first "Application for Adjudication of Claim" with the WCAB on February 9, 2004 (case No. SJO0244266), and a second application in August 2005 (case No. SJO0254688).[3] Steven D. Feinberg, M.D., the agreed medical evaluator (AME), examined Guzman on April 11, 2005, and issued supplemental reports on her progress thereafter. Dr. Feinberg diagnosed bilateral carpal tunnel syndrome, which had not been detected previously and which was the result of cumulative industrial trauma. In June 2005, Dr. Feinberg reviewed Dr. Fatteh's notes and concurred in the recommendation that Guzman remain off work temporarily.

---

[2] "Permanent and stationary" is defined in the PDRS as "the point in time when the employee has reached maximal medical improvement (MMI), meaning his or her condition is well stabilized and unlikely to change substantially in the next year with or without medical treatment." (PDRS, p. 1-2; Guides, p. 2.)

[3] Case No. SJO0244266 is the number applicable to the date of injury, November 5, 2003. Case No. SJO0254688 applies to the subsequent period ending April 11, 2005.

In his December 2, 2005 report, Dr. Feinberg noted Guzman's history of injuries prior to her employment with the District.[4] Guzman told him, however, that on November 5, 2003, she was in good health without any ongoing disability. Dr. Feinberg reported that Guzman continued to have cervical and lumbar discomfort as well as numbness and tingling in the hands "at times." Her symptoms were "worse with activity." Dr. Feinberg believed that Guzman was currently "permanent and stationary." Her spine condition precluded heavy lifting, and she had a "25% loss of her upper extremity preinjury capacity for pushing, pulling, grasping, gripping, keyboarding or fine manipulation." In an effort to apportion the disability, Dr. Feinberg attributed it to a combination of the 2003 injury, long-term work exposure, and other factors (e.g., genetics, habits, weight, and life exposure to nonindustrial conditions). Without speculating, however, he was unable to assign a percentage of the contribution from nonindustrial factors in this situation; consequently, he expressed the opinion that "the approximate percentage caused by the industrial injury/exposure is 100%."

On August 23, 2006, responding to a request for clarification from the District's attorney, Dr. Feinberg clarified his "apportionment" findings. He explained that the November 2003 injury was responsible for the spine disability (which precluded heavy lifting) and the 25 percent loss of her preinjury capacity for pushing, pulling, grasping, gripping, and fine manipulation.

On July 13, 2007, Dr. Feinberg responded to a request by the District that he reanalyze the extent of Guzman's permanent disability in accordance with the Guides, using version 2.49 of the Dexter evaluation and impairment software. Dr. Feinberg reexamined Guzman and reported a total "whole person impairment"[5] of 14 percent, consisting of 3 percent on each upper extremity due to carpal tunnel syndrome, 5 percent impairment related to the lumbar spine, and 5 percent impairment related to the cervical spine injury.[6]

On March 21, 2008, Dr. Feinberg again examined Guzman. He related the patient's treatment history, including extended psychotherapy for depression, and noted that she continued to have cervical and lumbar "discomfort" as well as numbness and tingling in the hands, a loss of grip strength, and pain in her right leg. Dr. Feinberg concluded that she was "certainly" permanent

---

[4] He briefly described a January 1998 foot injury; complaints of headaches in April 2000; a motor vehicle accident resulting in temporary neck, leg, arm and back pain; and complaints of headaches in October 2002.

[5] "Whole person impairment," often abbreviated as "WPI," is defined in the Guides as "[p]ercentages that estimate the impact on the individual's overall ability to perform activities of daily living, excluding work." (Guides, p. 603.)

[6] Dr. Feinberg did not explain precisely how he arrived at the total of 14 percent.

and stationary at that time. He again estimated her upper extremity loss to be 25 percent of her preinjury capacity "for pushing, pulling, grasping, gripping, keyboarding or fine manipulation," and again he could not reliably apportion the loss between the injury and nonindustrial causes. Consequently, he assigned 100 percent causation to the "industrial injury/exposure."

Guzman's attorney asked for clarification of the 25 percent loss estimate. Dr. Feinberg explained that for the patient's low back and neck pain, "the 'old' PDRS should be used and that the new AMA-based PDRS was applicable to the bilateral upper extremities." He reiterated that Guzman was "precluded for her upper extremities from very forceful, prolonged repetitive and forceful repetitive work activities." Dr. Feinberg pointed out that "there is often a discrepancy between the disability and the impairment. The type of problem she has is legitimate but does not rate very much (if anything) under the AMA Guides. Based on her ADL [activities of daily living] losses, each upper extremity would have a 15% WPI [(]25% of 60%). This is not a method that is sanctioned by the AMA Guides."

Guzman's case was tried on July 10 and October 3, 2008. By stipulation, the 1997 PDRS was applied in SJO0244266, while the 2005 PDRS was applied in SJO0254688, the upper extremity trauma. She had already been compensated for her temporary disability; only the extent and apportionment of her permanent disability were at issue.

Karen Wong, the evaluator from the Disability Evaluation Unit (DEU), testified that the Guides did not permit a medical evaluator to compute WPI directly from ADL (activities of daily living) loss.[7] "She d[id]n't know why it's improper for the doctor to complete his own whole person impairment directly from ADL loss, but she [was] confident that the AMA Guides don't allow it."[8] If the 15 percent WPI figure Dr. Feinberg referred to were used for each upper extremity, each would yield a 22 percent permanent disability, which would combine to amount to a 39 percent overall permanent disability. However, Wong instead relied solely on the "carpal tunnel" portion of Dr. Feinberg's March 21, 2008 report, which allowed up to 5 percent for each upper extremity. Thus, relying on Dr. Feinberg's assignment of impairment

---

[7] The DEU had received instructions to rate the injury to the upper extremities using the March 21, 2008 report, and to consider Dr. Feinberg's point that Guzman's ADL losses should produce a 15 percent WPI, but that the Guides do not sanction that method of determining impairment. If the DEU evaluator found the doctor's alternative method as "ratable," she was to calculate impairment by "whichever method produces the highest rating." Wong, however, was convinced that the Guides did not allow impairment to be determined directly from ADL loss, so she did not use the 15 percent figure in her rating.

[8] Wong said she had relied on Dr. Feinberg's statement that his impairment calculation based on ADL loss was not sanctioned by the Guides. She did not express an opinion about whether this statement was right or wrong, as it was not within her expertise.

based on the Guides, Wong rated Guzman's WPI as 3 percent for each upper extremity, for a total permanent disability of 12 percent.

In an October 22, 2008 amended ruling, the workers' compensation judge (WCJ) found that Guzman had sustained permanent partial disability of 41 percent in SJO0244266 and 12 percent in SJO0254688. The WCJ's decision was based on Dr. Feinberg's opinions as well as psychiatric reports by Michael D. Goldfield, M.D. The WCJ found no sufficient basis for attributing any permanent disability to Guzman's psychiatric injury, which was inseparable from the 2005 physical injury.

Noting the discrepancy between Dr. Feinberg's assessment of Guzman's injury outside the rating system provided in the Guides, the WCJ stated, "Applicant has advanced the theory that, since Dr. Feinberg has opined that the Applicant's impairment precludes a higher level of ADL's than described in the AMA Guides, Dr. Feinberg's report is a sufficient rebuttal of the Schedule and should be rated outside AMA [sic]. While the exact quantum of evidence required to rebut the PDRS has yet to be established by case law, I feel certain that a single paragraph in an AME report does not suffice. In particular, Dr. Feinberg provides no data or clinical observations in support of his opinion; his opinion seems to be, rather, that the [G]uides generally underrate this impairment. He may be correct; he is certainly a highly respected and qualified physician; but without a significant amount of objective data I am unwilling to accept his opinion, standing alone, against that of the Legislature."

Guzman petitioned for reconsideration of case No. SJO0254688 with the WCAB, contending that the evidence did not support the factual findings, the findings did not support the award, and the WCJ had exceeded his authority.[9] Relying on Dr. Feinberg's report of a 15 percent WPI per upper extremity (from 25 percent ADL loss), Guzman contended that her permanent disability "should be an adjusted 39 %, based upon the AME's clinical judgment and reporting, and the DEU rater's 10/03/2008 testimony." Guzman maintained that this method of calculation was consistent with the Guides. She was not, she insisted, seeking to rebut the current permanent disability schedule, but instead "to appropriately and accurately apply it." The Guides themselves, she argued, required the evaluating physician to exercise clinical judgment, and to take note of any functional loss of ADL's in deriving an impairment rating. Thus, it was a "mistake" to believe that the AMA (American Medical Association) did not approve of Dr. Feinberg's method of assessing impairment based on functional loss of ADL's. The WCJ should have recognized

---

[9] Only case No. SJO0254688 was the subject of the petition for reconsideration or any of the ensuing proceedings.

that the application of clinical judgment to the AME's assessment of impairment and disability, including impairment of ADL's, was consistent with the current PDRS.

Keenan & Associates responded that substantial evidence supported the WCJ's decision. If Guzman disagreed, she should have retained an expert to rebut Wong's rating. The WCJ agreed, noting that no direct evidence contradicted the expert opinion that the Guides may not be bypassed in favor of a physician's independent evaluation method. "On this record, it would be an abuse of discretion to rate in a manner other than that supported by the evidence."

The WCAB, however, granted the petition for reconsideration and combined the case with an ongoing dispute in *Almaraz v. Environmental Recovery Services (Almaraz)*.[10] In its ensuing decision on February 3, 2009, the WCAB ruled that "(1) the AMA Guides portion of the 2005 Schedule is rebuttable; (2) the AMA Guides portion of the 2005 Schedule is rebutted by showing that an impairment rating based on the AMA Guides would result in a permanent disability award that would be inequitable, disproportionate, and not a fair and accurate measure of the employee's permanent disability; and (3) when an impairment rating based on the AMA Guides has been rebutted, the WCAB may make an impairment determination that considers medical opinions that are not based or are only partially based on the AMA Guides." The WCAB accordingly remanded the matter to the WCJ to determine whether the standards it had outlined for rebutting the Guides had been met.

The State Compensation Insurance Fund (SCIF), the insurer in the *Almaraz* case, petitioned for reconsideration. The WCAB granted the petition and, in the interests of consistency, granted reconsideration on its own motion in Guzman's case.

On September 3, 2009, the WCAB issued its final decision in a four-to-three opinion partially reversing its February 3 decision. The majority reaffirmed its prior ruling that an impairment rating under the Guides was rebuttable, but it rejected the previous language allowing such rebuttal if those ratings resulted in an inequitable, disproportionate, and inaccurate rating of permanent disability. Under the Board's new holding, an employee or defendant could rebut the percentage of permanent disability under the 2005 Schedule "by successfully challenging any one of the individual

---

[10] Mario Almaraz was a truckdriver who hurt his back while pulling a tarp onto the top of the trailer portion of his truck. Challenging the WCJ's finding of a 14 percent permanent disability rating, he contended that the Guides should not be "blindly followed" where it did not fairly and accurately describe and measure the employee's impairment; in such cases, he argued, other measures of disability should be used.

component elements of the formula that resulted in the employee's scheduled rating." One of those components, the person's WPI, could be challenged through the presentation of evidence that a different chapter, table, or method contained in the Guides more accurately describes the impairment. Whether in the initial determination of WPI or in rebuttal, a physician could "utilize any chapter, table, or method in the AMA Guides that most accurately reflects the injured employee's impairment," but was not permitted to "go outside the four corners of the AMA Guides." The three-person minority of the Board disagreed with that restriction, preferring the first standard. This court granted the District's petition for writ review.

*Discussion*

### 1. Section 4660

■ The workers' compensation system in California underwent comprehensive reform in 2004 with the passage of Senate Bill No. 899 (2003–2004 Reg. Sess.). This was "an urgency measure designed to alleviate a perceived crisis in skyrocketing workers' compensation costs." (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1329 [57 Cal.Rptr.3d 644, 156 P.3d 1100]; but see *Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1557 [89 Cal.Rptr.3d 166] [both workers and employers were intended to benefit from Sen. Bill No. 899 (2003–2004 Reg. Sess.)].) The revised provisions substantially affected the assessment of an injured worker's permanent disability. A schedule for assessing permanent disability had been required since 1937, and it was always expressly intended to manifest "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule." (§ 4660, subd. (c).) As the WCAB observed, however, no guidance was provided for the formulation of the schedule until the 2004 amendment. In accordance with the revision, the administrative director is now required to develop and regularly amend the rating schedule based on specified data from empirical studies. The schedule "shall promote consistency, uniformity, and objectivity." (§ 4660, subd. (d).) As so directed, the administrative director published a new PDRS effective January 1, 2005, which incorporated the fifth edition of the Guides in its entirety. (Cal. Code Regs., tit. 8, § 9805; PDRS, p. 1-2.)

### 2. Impairment and Disability

The statutory revision most significant for the resolution of Guzman's case is the new condition that the determination of "the 'nature of the physical injury or disfigurement' shall incorporate the descriptions and measurements of physical impairments and the corresponding percentages of impairments published in the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (5th Edition)." (§ 4660, subd. (b)(1).)

First published in 1971 to provide "a standardized, objective approach to evaluating medical impairments" (Guides, § 1.1, p. 1), the AMA Guides sets forth measurement criteria that certified rating physicians and chiropractors can use to ascertain and rate the medical impairment suffered by injured workers. (*Id.,* § 1.2, p. 4.) "Impairment" is defined in the Guides as "a loss, loss of use, or derangement of any body part, organ system or organ function." (Guides, § 1.2, p. 2.) The impairment ratings provided in the Guides "were designed to reflect functional limitations and not disability." (Guides, § 1.2, p. 4.) They "reflect the severity of the medical condition and the degree to which the impairment decreases an individual's ability to perform common activities of daily living (ADL), *excluding* work."[11] (Guides, § 1.2, p. 4.)

A permanent disability, on the other hand, " ' "causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market." ' " (*Brodie v. Workers' Comp. Appeals Bd., supra,* 40 Cal.4th at p. 1320.) "A disability is considered permanent when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 10152.) Permanent disability is expressed as a percentage: Anything less than 100 percent (total disability) entitles the injured worker to a prescribed number of weeks of indemnity payments in accordance with that percentage. (Lab. Code, § 4658.) "Thus, permanent disability payments are intended to compensate workers for both physical loss and the loss of some or all of their future earning capacity." (*Brodie v. Workers' Comp. Appeals Bd., supra,* 40 Cal.4th at p. 1320.)

"In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his or her age at the time of the injury, consideration being given to an employee's diminished future earning capacity."[12] (§ 4660, subd. (a).) The "nature of the physical injury" refers to impairment, which is expressed as a percentage reflecting the "severity of the medical condition and the degree to which the impairment decreases an individual's ability to perform common activities of daily living (ADL),

---

[11] ADL consists of everyday activities such as self-care, personal hygiene, communication, physical activity, sensory function, nonspecialized hand activity (i.e., grasping, lifting, tactile discrimination), travel, sexual function, and sleep. (Guides, § 1.2, p. 4.)

[12] The prior version of section 4660, subdivision (a), referred to the "diminished ability of such injured employee to compete in an open labor market" rather than the employee's diminished future earning capacity. (See Stats. 1993, ch. 121, § 53, p. 1301.)

*excluding* work."[13] (Guides, § 1.2, p. 4, original italics.) In each case impairment ratings are combined and converted to a WPI rating,[14] which reflects the impact of the injury on the "overall ability to perform activities of daily living, excluding work."[15] (Guides, p. 603.) The WPI is then adjusted for diminished future earning capacity (DFEC), the employee's occupation classification at the time of the injury, and age.[16] Of these four components, it is the "nature of the injury," expressed in terms of impairment, that is the source of the controversy in this case.

3.  *Standard and Scope of Review*

The primary issue in this dispute is whether section 4660, following the 2004 revisions, permits deviation from a strict application of the descriptions, measurements, and percentages contained in the Guides for purposes of determining the impairment resulting from an employee's workplace injury. This question calls for construction and application of section 4660, and more specifically, subdivisions (b)(1) and (c) of that statute. "Issues of statutory interpretation are questions of law subject to our independent or de novo review. [Citations.] Nonetheless, unless clearly erroneous the WCAB's interpretation of the workers' compensation laws is entitled to great weight. [Citations.]" (*Genlyte Group, LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 714 [69 Cal.Rptr.3d 903]; see also *Vera v. Workers' Comp. Appeals Bd.* (2007) 154 Cal.App.4th 996, 1003 [65 Cal.Rptr.3d 151]; accord, *Tanimura & Antle v. Workers' Comp. Appeals Bd.* (2007) 157 Cal.App.4th 1489, 1494 [69 Cal.Rptr.3d 127].) At the same time, the workers' compensation statutes must be "liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of

---

[13] The authors explain the exclusion by pointing out that the "medical judgment used to determine the original impairment percentages could not account for the diversity or complexity of work but could account for daily activities common to most people. Work is not included in the clinical judgment for impairment percentages for several reasons: (1) work involves many simple and complex activities; (2) work is highly individualized, making generalizations inaccurate; (3) impairment percentages are unchanged for stable conditions, but work and occupations change; and (4) impairments interact with such other factors as the worker's age, education, and prior work experience to determine the extent of work disability. . . . As a result, impairment ratings are not intended for use as direct determinants of work disability." (Guides, § 1.2, p. 5.)

[14] A WPI rating of 0 percent means that the impairment "has no significant organ or body system functional consequences and does not limit the performance of the common activities of daily living." (Guides, § 1.2, p. 5.) A 90–100 percent WPI, on the other hand, "indicates a very severe organ or body system impairment requiring the individual to be fully dependent on others for self-care, approaching death." (Guides, § 1.2, p. 5.)

[15] Impairment of an upper extremity, for example, is converted to a WPI by multiplying the impairment rating by 0.6.

[16] DFEC is determined by applying a "formula based on empirical data and findings that aggregate the average percentage of long-term loss of income resulting from each type of injury for similarly situated employees." (§ 4660, subd. (b)(2).)

their employment." (§ 3202.) This rule is binding on both the Board and this court and is applicable to all aspects of workers' compensation law. (*Lundberg v. Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 436, 439 [71 Cal.Rptr. 684, 445 P.2d 300]; *Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1290 [135 Cal.Rptr.2d 665, 70 P.3d 1076].)

In construing section 4660, the reviewing court must "ascertain the intent of the Legislature so as to effectuate the purpose of the workers' compensation law. In determining such intent, we turn to the words in the statute and give effect to the statute according to the usual, ordinary import of the language used in framing it." (*Klee v. Workers' Comp. Appeals Bd.* (1989) 211 Cal.App.3d 1519, 1523 [260 Cal.Rptr. 217].) "When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] . . . ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' " (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387–388 [20 Cal.Rptr.2d 523, 853 P.2d 978].)

### 4. *Impairment Ratings Under Section 4660, Subdivision (b)(1)*

The District's position on appeal is a narrow one: Whereas the PDRS is rebuttable, the criteria set forth in the Guides are *not* rebuttable for purposes of making a determination of WPI. Relying primarily on section 4660, subdivision (b)(1), the District points out that determination of an employee's impairment must *incorporate* the descriptions and measurements set forth in the Guides. This provision, in the District's view, mandates the application of the Guides "as written" and "as intended" and prohibits physicians from "rewriting the *Guides* by applying 'any chapter, table or method' he/she deems more appropriate." Thus, the District argues, "the *Guides*, properly applied, are the final word on impairment. There is no other way to interpret the plain language of section 4660."

Several parties have filed amicus curiae briefs, most of them in support of the District.[17] Those parties join the District in arguing that the Guides must

---

[17] Amici curiae for the District are the California Chamber of Commerce; Employers Direct Insurance Company (Employers Direct), later renamed Pacific Compensation Insurance Company; John C. Duncan, Director of Industrial Relations; California Workers' Compensation Institute and American Insurance Association; and Steve Poizner, California Insurance

be used "as written" in order for the Schedule to promote consistency, uniformity, and objectivity. The Board's decision, they argue, defeats that objective by allowing impairment ratings to be based on chapters that do not apply to the employee's injury. The Insurance Commissioner adds that since the passage of Senate Bill No. 899 (2003–2004 Reg. Sess.) permanent disability costs have decreased and become "determinable, predictable, and quantifiable," an effect he believes will be lost with the current decision.

■ Applying the settled rules of statutory construction, we agree with the District that the Guides must be applied "as intended" and "as written," but we take a broader view of both its text and the statutory mandate. Section 4660, subdivision (b)(1), recognizes the variety and unpredictability of medical situations by requiring *incorporation* of the descriptions, measurements, and corresponding percentages in the Guides for each impairment, not their mechanical application without regard to how accurately and completely they reflect the actual impairment sustained by the patient. To "incorporate" is to "unite with or introduce into something already existent (Webster's 3d New Internat. Dict. (1993) p. 1145)," to "take in or include as a part or parts" (Random House Dict. of the English Language (2d ed. 1987) p. 968), or to "unite or combine so as to form one body." (American Heritage Dict. (3d ed. 1994) p. 588.) Section 4660, subdivision (b)(1), thus requires the physician to include the descriptions, measurements, and percentages in the applicable chapter of the Guides as part of the basis for determining impairment.

■ We cannot expand the statutory mandate by changing the word "incorporate" to "apply exclusively." Nor can we read into the statute a conclusive presumption that the descriptions, measurements, and percentages set forth in each chapter are invariably accurate when applied to a particular case. By using the word "incorporation," the Legislature recognized that not every injury can be accurately described by the classifications designated for the particular body part involved. Had the Legislature wished to require every complex situation to be forced into preset measurement criteria, it would have used different terminology to compel strict adherence to those criteria for every condition. A narrower interpretation would be inconsistent with the clear provision that the Schedule—which itself incorporates the Guides (PDRS, p. 1-2)—is rebuttable (§ 4660, subd. (c)), and it would not comport with the legislative directive to construe the workers' compensation statutes liberally "with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (§ 3202.)

We disagree with the District and its supporting amici curiae that this construction of section 4660, subdivision (b)(1), would defeat the legislative

Commissioner. In support of Guzman and the WCAB are the California Applicants' Attorneys Association and the California Society of Industrial Medicine and Surgery.

objective of consistency, uniformity, and objectivity. (§ 4660, subd. (d).) Just as it charges the Board with incorrectly attaching "prima facie evidence" to the measures of impairment in the Guides rather than the disability ratings in the Schedule, the District itself has attached the Legislature's goal of promoting consistency, uniformity, and objectivity of the *Schedule* to the impairment evaluation. Subdivision (d) of the statute is specifically addressed to the development, adoption, and amendment of the Schedule itself, not the physician's evaluation of impairment. Nevertheless, we have no reason to question the implicit assumption that while directing those features to the Schedule itself, the Legislature sought consistency, uniformity, and objectivity in the overall process of determining disability across individuals.

The District agrees with the statement by the authors of the Guides that its application "as intended" facilitates "an appropriate and reproducible assessment to be made of clinical impairment." (Guides, p. 11.) However, the District omits the rest of that paragraph, which makes a rather different point, an important one: "The physician's *judgment*, based upon experience, training, skill, thoroughness in clinical evaluation, and ability to apply the *Guides* criteria as intended, will enable an appropriate and reproducible assessment to be made of clinical impairment. Clinical judgment, combining both the 'art' and 'science' of medicine, constitutes the essence of medical practice." (Guides, § 1.5, p. 11.) The Guides itself recognizes that it cannot anticipate and describe every impairment that may be experienced by injured employees. The authors repeatedly caution that notwithstanding its "framework for evaluating new or complex conditions," the "range, evolution, and discovery of new medical conditions" preclude ratings for every possible impairment. (Guides, § 1.5, p. 11.) The Guides ratings do provide a standardized basis for reporting the degree of impairment, but those are "consensus-derived estimates," and some of the given percentages are supported by only limited research data. (Guides, pp. 4, 5.) The Guides also cannot rate syndromes that are "poorly understood and are manifested only by subjective symptoms." (*Ibid.*)

To accommodate those complex or extraordinary cases, the Guides calls for the physician's exercise of clinical judgment to assess the impairment most accurately. Indeed, throughout the Guides the authors emphasize the necessity of "considerable medical expertise and judgment," as well as an understanding of the physical demands placed on the particular patient. (Guides, p. 18.) "The physician must use the entire range of clinical skill and judgment when assessing whether or not the measurements or tests results are plausible and consistent with the impairment being evaluated. If, in spite of an observation or test result, the medical evidence appears insufficient to verify that an impairment of a certain magnitude exists, the physician may modify the impairment rating accordingly and then describe and explain the reason for the modification in writing." (Guides, p. 19.) The PDRS itself

instructs physicians that if a particular impairment is not addressed by the AMA Guides, they "should use clinical judgment, comparing measurable impairment resulting from the unlisted objective medical condition to measurable impairment resulting from similar objective medical conditions with similar impairment of function in performing activities of daily living."[18] (PDRS, p. 1-4.)

■ Accordingly, while we agree with the District that the Guides should be applied "as intended" by its authors, such application must take into account the instructions on its use, which clearly prescribe the exercise of clinical judgment in the impairment evaluation, even beyond the descriptions, tables, and percentages provided for each of the listed conditions. The Board aptly observed that the descriptions, measurements, and percentages cannot be dissociated from the balance of the Guides, particularly chapters 1 and 2, which contain the instructions on the appropriate use of the ensuing chapters to perform an accurate and reliable impairment evaluation. "Thus, the AMA Guides is an integrated document and its statements in Chapters 1 and 2 regarding physicians using their clinical judgment, training, experience and skill cannot be divorced from the balance of the Guides."

The District and supporting amici curiae nevertheless maintain that the Board's decision will result in burdensome litigation, inconsistent ratings, employer-employee conflicts, and "doctor shopping." They contend that the "very foundation of the new statute" will be subverted because it will allow a physician "unrestrained license" to manipulate the Guides through an "ad hoc" approach based on subjective considerations, "without any need to evaluate the doctor's opinion against the objective evidence." According to the Chamber of Commerce, the Guides will be rendered "*irrelevant* whenever a[n] evaluating physician and/or the WCJ disagrees with the result." Like the District, which warns that a physician will now be able to "make up impairment values where none exist," Employers Direct is concerned that the physician's opinion will prevail simply by its "mantra of accuracy." The District invokes the scenario of a spine injury accompanied by difficulty lifting and sleep disturbance, which the physician evaluates by using chapter 6.6 on hernias or chapter 13.3c on sleep disorders or both, thus arriving at a radically different impairment value than that prescribed in chapter 15 on the spine. The Chamber of Commerce illustrates its position with the same example: Instead of requiring evaluation of a lumbar spine injury using chapter 15, the Board's decision "would actually allow a physician to base impairment in [*sic*] Chapter Six (Digestive System), ordinarily reserved for

---

[18] Similarly, when multiple impairments result from a single injury, the physician must exercise judgment to avoid duplication of effects on function of the injured body part, to the extent that the Guides do not provide direction regarding combining the impairments. (PDRS, p. 1-5.)

impairment due to a hernia—*even in the absence of a hernia*—if the physician decides that it really is 'more accurate.' Or, even though the Guides specifically disfavor impairment ratings based on 'grip loss' or 'gait derangement' due to the inherently subjective nature of the testing, the decision below would permit a finding of impairment based on these disapproved methods . . . so long as the physician subjectively believes that they really provide a more accurate representation of the impairment."

The abuses the District and its amici curiae envision are not inevitable outcomes of the WCAB's decision, however. Any patient can shop for the most favorable physician report regardless of how strictly the Guides are applied, as examinations, testing, and conclusions can vary among physicians in any given context. As to the second point urged by the District and its amici curiae, the Board emphasized that its decision does *not* allow a physician to conduct a fishing expedition through the Guides "simply to achieve a desired result"; the physician's medical opinion "must constitute substantial evidence" of WPI and "therefore . . . must set forth the facts and reasoning [that] justify it." "In order to constitute substantial evidence, a medical opinion must be predicated on reasonable medical probability. [Citation.] Also, a medical opinion is not substantial evidence if it is based on facts no longer germane, on inadequate medical histories or examinations, on incorrect legal theories, or on surmise, speculation, conjecture, or guess. [Citation.] Further, a medical report is not substantial evidence unless it sets forth the reasoning behind the physician's opinion, not merely his or her conclusions. [Citation.]" (*E.L. Yeager Construction v. Workers' Comp. Appeals Bd.* (2006) 145 Cal.App.4th 922, 928 [52 Cal.Rptr.3d 133].)

Accordingly, a physician's medical opinion that departs unreasonably from a strict application of the Guides can be challenged, and it would not be acceptable as substantial evidence or fulfill the overall goal of compensating an injured employee commensurate with the disability he or she incurred through the injury. If Guzman's carpal tunnel syndrome, for example, is adequately addressed by the pertinent sections of chapter 16, an impairment rating that deviates from those provisions will properly be rejected by the WCJ. As the Board's decision does not disregard, retreat from, or compromise the requirement of substantial evidence, we cannot conclude that it erred to the extent that it allows physicians to use their clinical judgment in applying the Guides. The District's assertion that the WCAB's decision encourages a physician to misapply the Guides freely by using " 'any chapter, table or method' he/she deems more appropriate" is not well taken.

Unlike the District, which acknowledges the importance of the Guides instructions, amicus curiae Employers Direct insists that section 4660 permits incorporation of *only* the " 'descriptions and measurements of physical

impairments and the corresponding percentages of impairments published in the [Guides]' into the definition of 'the nature of the physical injury or disfigurement.' " According to this theory, the Legislature did not intend to incorporate any other portions of the Guides, including the first two chapters instructing physicians on the proper use of the Guides to evaluate impairment.[19] We reject this argument. Those first two chapters make it clear that an impairment rating based solely on the descriptions, measurements, and percentages in the succeeding chapters without the use of physicians' clinical judgment, training, experience, and skill would contravene the assumptions and intent of the authors. The failure to follow all of the instructions in the first two chapters could result in useless evidence, inadequate diagnostic reasoning, and inaccurate and inconsistent ratings.

The Board thus correctly rejected the argument that only the descriptions and measurements of impairments with their corresponding percentages may be incorporated into the WPI assessment. The statute, noted the Board, did not *prohibit* incorporation of the portions outside the descriptions, measurements, and percentages in a complex case not addressed by the chapter devoted to the affected body part or system. In the Board's view, the administrative director complied with the statutory mandate by adopting and incorporating the *entire* Guides without limitation. As a result, the Board concluded, "the entire AMA Guides is part of the Schedule." Given the comprehensiveness and precision attendant in the chapters pertaining to each system, in most cases a WCJ will credit ratings based strictly on the chapter devoted to the body part, region, or system affected.

5. *Rebuttal of the PDRS*

█ The WCAB rested its decision in part on section 4660, subdivision (c), which states that the PDRS constitutes "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule." "A statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption." (Evid. Code, § 602.) Accordingly, as "prima facie evidence" the Schedule is not "absolute, binding and final. [Citations.] It is therefore not to be considered all of the evidence on the degree or percentage of disability. Being prima facie it establishes only presumptive evidence [which] may be controverted and overcome." (*Universal City Studios, Inc. v. Worker's Comp. Appeals Bd.* (1979) 99 Cal.App.3d 647, 662–663 [160 Cal.Rptr. 597].)

---

[19] The California Workers' Compensation Institute and the American Insurance Association take the opposite approach, arguing instead that the decision is wrong because it "does not require the physician to follow the explicit directions and instructions established within the AMA Guides."

■ As the District acknowledges, the 2004 amendment of section 4660 did not alter the prior versions that deemed the rating schedule to be "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule."[20] (See *Frankfort General Ins. Co. v. Pillsbury* (1916) 173 Cal. 56, 58–60 [159 P. 150].) The Board noted preamendment decisions confirming the rebuttability of the Schedule. (See, e.g., *Glass v. Workers' Comp. Appeals Bd.* (1980) 105 Cal.App.3d 297, 307 [164 Cal.Rptr. 312] [where schedule does not accurately reflect true disability, "it may be controverted and overcome"]; cf. *Universal City Studios, Inc. v. Worker's Comp. Appeals Bd., supra*, 99 Cal.App.3d at p. 663 [presumption "totally overcome" by evidence that employee medically able to return to work but chose not to do so].) "The Legislature is deemed to be aware of judicial decisions already in existence and to have enacted or amended a statute in light thereof. [Citation.] When a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it." (*Stavropoulos v. Superior Court* (2006) 141 Cal.App.4th 190, 196 [45 Cal.Rptr.3d 705]; see *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572 [88 Cal.Rptr.2d 19, 981 P.2d 944].)

The WCAB's decision permits rebuttal of the PDRS by challenging "any one of the component elements of the formula that resulted in the employee's scheduled rating—such as the injured employee's WPI under the AMA Guides." To make an impairment determination in rebuttal of the Schedule, the physician is permitted by the Board to use the "four corners of the Guides."

The Board stated that by having the latitude to use the "four corners" of the Guides, the physician "is not inescapably locked into any specific paradigm for evaluating WPI under the Guides." The statute, the Board reasoned, "does not mandate that the impairment for any particular condition must be assessed in any particular way under the Guides [or] relegate a physician to the role of taking a few objective measurements and then mechanically and uncritically assigning a WPI that is based on a rigid and standardized protocol and that is devoid of any clinical judgment. Instead, the AMA Guides expressly contemplates that a physician will use his or her judgment, experience, training, and skill in assessing WPI."

Nevertheless, the District, the Director of Industrial Relations, and the California Chamber of Commerce interpret subdivision (c) of section 4660 to

---

[20] The Board has previously noted the retention of this language. (See *Costa v. Hardy Diagnostic* (2006) 71 Cal.Comp.Cases 1797.)

mean that only the *final* percentage rating of disability can be rebutted, not any one of its four components. Likewise, Employers Direct would limit rebuttal to "a substantive level beyond the elements defined by the Legislature." None explains, however, how the "*end product*" or higher "substantive level" is rebuttable without challenging any of its elements.

The Chamber of Commerce reiterates the view that if the decision stands, the Guides "could be rebutted whenever they yield a result that someone concludes is 'inaccurate.' " Simply presenting a view contrary to an established rating in the Guides, however, would not be sufficient to rebut the PDRS rating. As discussed earlier, an impairment rating that is inadequately supported by evidence and reasoning—and unquestionably, a rebuttal position arrived at by hunting through the Guides for a more favorable rating—will result in an opinion the WCJ will necessarily reject as insufficient evidence. The Board itself emphasized that substantial evidence is necessary to establish a permanent disability, and any opinion proffered without "facts and reasoning [that] justify it" will not be sufficient. Any WCJ would err by allowing the scheduled rating to be rebutted based on an obviously inapplicable section of the Guides.[21]

As discussed earlier, the PDRS has expressly incorporated the entire Guides, which necessarily includes its instructions on the proper application of the chapters pertaining to each specific body area or system—notably, the authors' recommendation that physicians use clinical judgment when a condition is not covered by the impairment ratings in the Guides. The Board's decision is consistent with those instructions by acknowledging the necessity of the physician's exercise of "judgment, experience, training, and skill in assessing WPI."

■ At the same time, however, the WCAB majority did not explain how far the physician may go in relying on the "four corners" when the descriptions, tables, and percentages pertaining to an injury do not accurately describe the injured employee's impairment.[22] If the physician expresses the opinion that the chapter applicable to a particular kind of injury does not describe the employee's injury, but all other chapters address completely different biological systems or body parts, it would likely be difficult to demonstrate that that alternative chapter supplies substantial, relevant evidence of an alternative WPI rating. In order to support the case for rebuttal,

---

[21] Indeed, the WCJ in this case rejected Dr. Feinberg's rebuttal for lack of "data or clinical observations in support of his opinion."

[22] The dissent would have returned to the Board's first decision and allowed rebuttal by considering factors *outside* the Guides whenever its application would be "inequitable, disproportionate, and not a fair and accurate measure of the [injured] employee's permanent disability." Guzman has not suggested that we revisit this earlier standard.

the physician must be permitted to explain why departure from the impairment percentages is necessary and how he or she arrived at a different rating. That explanation necessarily takes into account the physician's skill, knowledge, and experience, as well as other considerations unique to the injury at issue. In our view, a physician's explanation of the basis for deviating from the percentages provided in the applicable Guides chapter should not a priori be deemed insufficient merely because his or her opinion is derived from, or at least supported by, extrinsic resources. The physician should be free to acknowledge his or her reliance on standard texts or recent research data as a basis for his or her medical conclusions, and the WCJ should be permitted to hear that evidence. If the explanation fails to convince the WCJ or WCAB that departure from strict application of the applicable tables and measurements in the Guides is warranted in the current situation, the physician's opinion will properly be rejected. Without a complete presentation of the supporting evidence on which the physician has based his or her clinical judgment, the trier of fact may not be able to determine whether a party has successfully rebutted the scheduled rating or, instead, has manipulated the Guides to achieve a more favorable impairment assessment.

6. *Illegal Regulation*

The District finally asserts that the WCAB "usurped the [administrative director's] authority to create a Schedule as set forth in section 4660 by asserting [that] the *Guides* need not be applied as written, to derive a [permanent disability] rating." According to the District, the Board "has substituted its priorities (deriving the 'most accurate' impairment) for the Legislature's primary concerns: (a) consistency, uniformity, and objectivity; and (b) providing relief from the workers' compensation crisis." By "attacking and rewriting the *Guides*," and thereby "adopting an entirely new and different methodology of calculating [permanent disability], the WCAB has effectively created new regulations," in violation of the Administrative Procedure Act. (Gov. Code, § 11340 et seq.)

We cannot reach the conclusion urged by the District because the premise of its argument is faulty. The decision does not create a new manner of calculating permanent disability or "an exception that swallows the Schedule." It requires application of the Guides as written, including the instructions on its proper use. As discussed, if the chapter applicable to the injury under scrutiny is disregarded by the examining physician without a sufficient evidentiary basis, the physician's conclusions will necessarily be rejected.

*Conclusion*

By using the word "incorporate" and retaining a prima facie standard for the introduction of the PDRS ratings, the Legislature obtained a more

consistent set of criteria for medical evaluations while allowing for cases that do not fit neatly into the diagnostic criteria and descriptions laid out in the Guides. The Guides itself recognizes that it cannot anticipate and describe every impairment that may be experienced by injured employees. To accommodate those complex or extraordinary cases, it calls for the physician's exercise of clinical judgment to evaluate the impairment most accurately, even if that is possible only by resorting to comparable conditions described in the Guides. The PDRS has expressly incorporated the entire Guides, thereby allowing impairment in an individual case to be assessed more thoroughly and reliably.

### Disposition

The decision of the WCAB is affirmed.

Premo, Acting P. J., and Duffy, J., concurred.

On September 1, 2010, the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied November 10, 2010, S186777.